IN THE COURT OF APPEALS OF TENNESSEE
WESTERN SECTION AT NASHVILLE

FILED

Jan. 26, 1996

Cecil Crowson, Jr.
Appellate Court Clerk

PENNY CAMPBELL, ET AL,

    Plaintiffs-Appellees,

Vs.

Davidson Circuit No. 93C-1547
C.A. No. 01A01-9507-CV-00321

DON SUNDQUIST, Governor of
the State of Tennessee, et al,

    Defendants-Appellants.

_____

FROM THE CIRCUIT COURT OF DAVIDSON COUNTY

THE HONORABLE WALTER C. KURTZ, JUDGE

Charles W. Burson, Attorney General and Reporter
Jerry L. Smith, Deputy Attorney General
For Defendants-Appellants

Abby R. Rubenfeld of Nashville
For Plaintiffs-Appellees

Rebecca L. Brown, Robert K. Rasmussen, Susan L. Kay of Nashville
For Amicus Curiae, American Civil Liberties Union of Tennessee

James L. McHugh, Jr., Carolyn I. Polowy and Paul M. Smith
of Washington, D.C.; Irwin Venick of Nashville, For Amicus Curiae,
American Psychological Association, The National Association of
Social Workers, and The Tennessee Chapter of the National
Association of Social Workers

Glen G. Dukes, Jr., of Nashville
Suzanne Goldberg, Staff Attorney, LAMBDA Legal Defense
& Education of New York
For LAMBDA Legal Defense and Education and
The Tennesseans for Equality

Peggy June Griffin of Dayton, Amicus Curiae, Pro Se

*AFFIRMED*

W. FRANK CRAWFORD,
PRESIDING JUDGE, W.S.

*CONCURS:*
DAVID R. FARMER, JUDGE

*DISSENTS IN PART, CONCURS IN PART:*

BEN H. CANTRELL, JUDGE

This appeal involves a constitutional challenge under the Tennessee Constitution to Tennessee's Homosexual Practices Act, T.C.A. § 39-13-510 (1991). On May 26, 1993, plaintiffs Penny Campbell, John Doe, Jane Doe, James Tallent, and Christopher Simien,[1] filed a "Verified Petition for Declaratory and Injunctive Relief" in the Circuit Court for Davidson County, Tennessee, against defendants Don Sundquist, Governor of the State of Tennessee,[2] Charles W. Burson, Attorney General of the State of Tennessee, and Victor S. Johnson, III, District Attorney General for Davidson County, each in his official capacity. The complaint, as amended, seeks a declaratory judgment pursuant to T.C.A. § 29-14-101, *et seq.*, (1980) that the Homosexual Practices Act (HPA), a criminal law, violates plaintiffs' right to privacy under Article I, Sections 1, 2, 3, 7, 8, 19, and 27 of the Tennessee Constitution and their right to equal protection of the laws under Article I, Section 8 of the Tennessee Constitution. Plaintiffs also seek to enjoin the enforcement of the HPA.

Each of the plaintiffs admitted that they have violated the HPA in the past,

---

[1]In the original Verified Petition for Declaratory and Injunctive Relief there were six named plaintiffs. One plaintiff, Chadwick Freeman Presswood of Knox County voluntary dismissed his claims against the defendants. In addition, original plaintiff Jane Roe was replaced by plaintiff Jane Doe. The identity of Plaintiff Jane Doe was placed under seal by the trial court due to Doe's concerns that she would be evicted under her rental housing lease if her violations of the Homosexual Practices Act were revealed publicly. Similarly, the identity of plaintiff John Doe was placed under seal due to Doe's concern that he would be fired from his job if his violations of the HPA became known to his employer.

[2]The original named defendant as Governor of the State of Tennessee was Ned R. McWherter, who at the time of the filing of this suit was serving as Governor. In January of 1995, Pursuant to T.R.A.P. 19(c) and Tenn.R.Civ.P. 24.04 Governor Don Sundquist was substituted as a party in place of former Governor McWherter.

and that they intend to continue violating the HPA in the future. Plaintiffs allege that they are each harmed by the HPA because it criminalizes their private, intimate conduct, and that each of them believe they are threatened with prosecution for violations of the statute, which could result in plaintiffs losing their jobs, professional licenses, and/or housing should they be convicted.

Defendants answer filed September 24, 1993, denies that the HPA violates any provision of the Tennessee Constitution.

On July 16, 1993, the defendants filed a Motion to Dismiss on the grounds, *inter alia*, that the plaintiffs' petition sought an advisory opinion which the court was not authorized to render, that none of the plaintiffs had been prosecuted under the Act and therefore their allegations were speculative and hypothetical, that the plaintiffs lacked standing, and that the issue presented was not ripe or justiciable. On October 4, 1993, the trial court denied the defendants' motion to dismiss, finding that the Declaratory Judgment Act, T.C.A. § 29-14-101, *et seq.*, could properly be used to challenge the constitutionality of statutes imposing criminal sanctions on individuals, and that the plaintiffs had standing to bring this action. On October 4, 1994, the defendants moved for summary judgment on the grounds, *inter alia*, that this case presented only a question of law, that the applicable statute of limitations had elapsed, that this action could not properly be maintained under the Declaratory Judgment Act, and that the Tennessee Constitution was not violated by the HPA. On December 7, 1994, the trial court entered an order denying the defendants' motion for summary judgment.

On December 7, 1994, the plaintiffs filed a motion for summary judgment, supported by affidavits of ten expert witnesses as well as discovery materials previously filed with the court. On February 2, 1995, the trial court entered an

3

order granting summary judgment to the plaintiffs.  In its order the trial court found that private sexual activity between consenting adults of the same sex is protected by the state constitutional right to privacy, that the State had failed to show a compelling state interest sufficient to prohibit private sexual activity between consenting adults of the same sex, and that the HPA is overbroad in that it prohibits behavior which is constitutionally protected.  The court pretermitted the equal protection issue and declined to enjoin the enforcement of the HPA.

The appellants timely filed a notice of appeal on February 24, 1995, and present four issues for our review.  As stated in the appellants' brief those issues are:

> Whether the trial court erred in ruling that the plaintiffs could bring this action against state officials under the Tennessee Declaratory Judgment Act?

> Whether the trial court erred in ruling that there was sufficient state action to allow the plaintiffs to maintain their claims when plaintiffs admitted none of them is or ever has been directly threatened with or subjected to prosecution  under T.C.A.  § 39-13-510?

> Whether the trial court erred in holding that the plaintiffs filed this case within the applicable statute of limitations when the record shows  § 39-13-510 became effective on November 1, 1989, and no state action other than passage of the act is alleged, and this action was filed on May 26, 1993.

> Whether the trial court erred in holding that the right to privacy first announced in *Davis v. Davis*, 842 S.W.2d 588 (Tenn. 1992); encompasses the right to engage in homosexual sodomy and that the state must demonstrate a compelling state interest to prohibit such activity?

The appellees also present two additional issues for our review.  As stated in the appellees' brief, those issues are:

> Whether the "Homosexual Acts" Statute which criminalizes  certain  private  sexual  acts  between

4

consenting adults while leaving the very same acts legal when engaged in by different adults, creates a constitutionally-impermissible classification that violates the right to equal protection of the laws guaranteed by the Tennessee Constitution?

Whether an injunction should be issued against enforcement of T.C.A. § 39-13-510 because it is an unconstitutional criminal statute that imposes an unwarranted restriction on the fundamental right to privacy as protected by the Tennessee Constitution?

This case is before us pursuant to the trial court's grant of summary judgment to the plaintiffs. A trial court should grant a motion for summary judgment only if the movant demonstrates that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. Tenn.R.Civ.P. 56.03; *Byrd v. Hall*, 847 S.W.2d 208, 210 (Tenn. 1993); *Dunn v. Hackett*, 833 S.W.2d 78, 80 (Tenn. App. 1992). The party moving for summary judgment bears the burden of demonstrating that no genuine issue of material fact exists. *Byrd*, 847 S.W.2d at 210. When a motion for summary judgment is made, the court must consider the motion in the same manner as a motion for directed verdict made at the close of the plaintiff's proof; that is, "the court must take the strongest legitimate view of the evidence in favor of the nonmoving party, allow all reasonable inferences in favor of that party, and discard all countervailing evidence." *Id.* at 210-11. In *Byrd*, the Tennessee Supreme Court stated:

> Once it is shown by the moving party that there is no genuine issue of material fact, the nonmoving party must then demonstrate, by affidavits or discovery materials, that there is a genuine, material fact dispute to warrant a trial. [citations omitted]. In this regard, Rule 56.05 provides that the nonmoving party cannot simply rely upon his pleadings but must set forth *specific facts* showing that there is a genuine issue of material fact for trial.

*Id.* at 211. (emphasis in original). Disputed facts "must bear directly and

materially upon the legal elements of the claim or defense being tested by the summary judgment motion." *Phan v. Sanders*, 818 S.W.2d 18, 19 (Tenn. App. 1991) (quoting *Macon County Livestock Market, Inc. v. Kentucky State Bank, Inc.*, 724 S.W.2d 343, 348 (Tenn. App. 1986)).

T.C.A. § 39-13-510 (1991) provides:

> Homosexual acts- It is a Class C misdemeanor for any person to engage in consensual sexual penetration, as defined in § 39-13-501(7), with a person of the same gender.

T.C.A. § 39-13-501(7) (1991) provides:

> "Sexual penetration" means sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required. . . .

I. Standing to Maintain This Action Under the Declaratory Judgment Act

We will first address the appellants' arguments regarding the plaintiffs' standing to bring this action under the Declaratory Judgment Act. In doing so we consider plaintiffs' first two issues together. The appellants argue that the plaintiffs do not have standing to maintain this action, because none of the plaintiffs have been prosecuted under the HPA; therefore, none of them have suffered an injury as a result of the statute. The appellants further argue that of the twenty-five arrests reported for violations of T.C.A. § 39-13-510, twelve resulted from public activity, and one resulted from activity involving a juvenile. The appellants contend that while the disposition of the remaining twelve arrests is unknown, the appellees have failed to show that there have been any arrests for purely private, consensual, adult, sexual activity; therefore, the appellees are asking this Court to render an advisory opinion regarding a hypothetical future

6

occurrence.

The appellees, on the other hand, adamantly assert that they have standing based on the fact that they face possible criminal penalties for engaging in constitutionally protected conduct. The appellees argue that because they are homosexuals, the statute imposes an actual threat of prosecution upon them, and this threat is an injury which is "not common to the body of citizenry." Therefore, they have standing under Tennessee's Declaratory Judgment Act to maintain this suit.

The trial court found that the plaintiffs have standing to bring this action. The court relied on *Erwin Billiard Parlor v. Buckner*, 156 Tenn. 278, 300 S.W. 565 (1927), and found that each of the plaintiffs has a distinct interest in the HPA, not shared by the general public, such that they are entitled to maintain an action to determine the constitutionality of the HPA under the Declaratory Judgment Act. We agree.

In *Morristown Emergency & Rescue Squad, Inc., v. Volunteer Dev. Co., Inc.*, 793 S.W.2d 262 (Tenn.App. 1990), this Court stated, "the essential element of standing is an allegation that the ordinance will inflict some injury on the complainant not common to the body of citizenry." *Id.* at 263 (citing *Patten v. Mayor of Chattanooga*, 108 Tenn. 197, 65 S.W. 414 (1901)); *accord, Parks v. Alexander*, 608 S.W.2d 881, 891 (Tenn.App. 1980)(To have standing plaintiffs must allege "special interest or injury peculiar to themselves as opposed to the public in general."). In *Erwin Billiard Parlor v. Buckner*, 156 Tenn. 278, 300 S.W. 565 (1927), the plaintiff brought a declaratory judgment action seeking to challenge the constitutionality of Chapter 104 of the Private Acts of 1925 which criminalized the operation of pool and billiard halls for profit in counties with a population of less than 10,015 or more than 10,025 people. *Id.* at 279-80. The plaintiffs, who owned

7

a billiard hall[3] and had been threatened with prosecution by the sheriff, brought a declaratory judgment action arguing that the Act violated their rights under the Tennessee Constitution. The Court allowed the maintenance of the action, even though the plaintiffs had not been prosecuted under the Act, and found that the Act violated the plaintiffs' constitutional rights under the Tennessee Constitution. The Court, addressing the plaintiffs' standing to bring the action, stated:

> The complainants show by the averments of their bill that they have a special interest in the question of the constitutionality of the penal statute described in the bill, distinct from the interest of the public generally, in that their investment and property rights will be directly affected and injured by its enforcement.
>
> We are of the opinion that a person so situated is entitled to bring and maintain an action for the determination of the proper construction or constitutionality of such a statute, under the provisions of the Declaratory Judgments Law.

*Erwin*, 156 Tenn. at 281-82.

In *Erwin*, unlike the case at bar, plaintiffs had been threatened with prosecution by the sheriff. However, as noted above, the Court's decision concerning standing was premised on plaintiffs' special interest. The sheriff's threat of prosecution was significant only as to the sheriff being named as a party defendant. We think the plaintiffs' status as homosexuals confers upon them an interest distinct from that of the general public with respect to the HPA, and that they are therefore entitled to maintain an action under the Declaratory Judgment Act even though none of them have been prosecuted under the HPA. This conclusion is also supported by *Leech v. American Booksellers Ass'n*, 582 S.W.2d 738 (Tenn. 1979), discussed below.      In addition to raising

---

[3]The billiard hall was located in Unicoi County which at the time had a population which subjected the county to the provisions of the Act.

issues of standing, the appellants also argue that this constitutional suit cannot be brought against the State, because there is no enabling statute which authorizes the suit. The appellants first argue that this Court does not have jurisdiction to entertain this action, because Article I, Section 17 of the Tennessee Constitution prohibits a suit against the State unless such suit is brought in strict compliance with an enabling statute. Article I, Section 17 of the Tennessee Constitution provides, "Suits may be brought against the State in such manner and in such courts as the legislature may by law direct." The appellants argue that because there is no enabling statute which authorizes a suit against the State on state constitutional grounds, Article I, Section 17 serves to bar the plaintiffs from maintaining this action. The appellants, relying on *Northern Telecom, Inc. v. Taylor*, 781 S.W.2d 837 (Tenn. 1989), further argue that the Tennessee Declaratory Judgment Act, 29-14-101, *et seq.*, cannot constitute an enabling statute allowing the plaintiffs to bring this suit, because the State is not specifically mentioned in the Act.

We disagree. T.C.A. § 29-14-103 provides:

> Construction of statutes and written instruments.-- Any person interested under a deed, will, written contract, or other writings constituting a contract, or *whose rights, status, or other legal relations are affected by a statute*, municipal ordinance, contract, or franchise, may have determined any question of construction or validity arising under the instrument, statute, ordinance, contract, or franchise and obtain a declaration of rights, status or other legal relations thereunder. (Emphasis supplied).

The Declaratory Judgment Act "should be liberally construed in favor of the person seeking relief in a proper case to the end that rights and interests be expeditiously determined." *Tennessee Farmers Mut. Ins. Co. v. Hammond*, 290 S.W.2d 860, 862 (Tenn. 1956). Although the Tennessee Declaratory Judgment Act is to be liberally construed, certain limitations have been placed upon the

power of courts to entertain suits brought under the Act. T.C.A. § 20-13-102 (1992) prohibits courts from entertaining suits against the state "or against any officer of the state acting by authority of the state, with a view to reach the state, its treasury, funds or property." In addition, a court should not entertain a suit under the Declaratory Judgment Act if the resolution of the dispute would require a "judicial investigation of disputed facts." *Standard Accident Ins. Co. v. Carvin*, 400 S.W.2d 235, 236 (quoting *Newsum v. Interstate Realty Co.*, 152 Tenn. 302, 305, 278 S.W. 56 (1925)). The existence of a justiciable controversy is also a jurisdictional prerequisite to the maintenance of an action under the Act. *Parks v. Alexander*, 608 S.W.2d 881, 891-92 (Tenn.App. 1980)(citing *Jared v. Fitzgerald*, 183 Tenn. 682, 689, 195 S.W.2d 1, 4 (1946)). In view of the remedial purpose of the Tennessee Declaratory Judgment Act, we view the Act as an enabling statute to allow a proper plaintiff to maintain a suit against the State challenging the constitutionality of a state statute. The appellants' reliance upon *Northern Telecom, Inc. v. Taylor*, 781 S.W.2d 837 (Tenn. 1989), and *Carter v. McWherter*, 859 S.W.2d 343 (Tenn.App. 1993), for the proposition that an action under the Declaratory Judgment Act may not be maintained against the State, is misplaced. In *Northern Telecom* the plaintiff brought a declaratory judgment action against the State Commissioner of Revenue seeking a refund of taxes which the plaintiff had paid under protest. *Id*. at 838. The Supreme Court held that the plaintiff could not maintain the action against the State, because the action was designed "to reach the state, its treasury, funds, or property." *Id*. at 839-40. In ruling on the Declaratory Judgment issue the Supreme Court, quoting *Hill v. Beeler*, 199 Tenn. 325, 332-33, 286 S.W.2d 868, 871 (1956), stated,

> The Declaratory Judgment Act [ § 29-14-101], et seq.,
> does not permit the filing of a suit against the State to
> construe statutes so it seems to us that there is no

10

> authority for the suit but that Code Section [20-13-102]
> expressly forbids such an action.

*Northern Telecom*, 781 S.W.2d at 840.

The appellants rely on the above quoted statement in *Northern Telecom* in forwarding their argument that the instant action is barred, because it is an action against the State which seeks to construe a statute. We disagree, because this argument takes *Northern Telecom* out of the context in which it was decided. The Declaratory Judgment Act expressly provides that courts are empowered to declare rights under, and construe, statutes. *Hill*, *Northern Telecom*, and *Carter* are inapplicable to the declaratory judgment question presented by the case before us. In all three of these cases in which the Courts held that the respective plaintiffs' actions could not be maintained under the Declaratory Judgment Act, the plaintiffs' actions were designed, in some fashion or other, to reach the state treasury, state funds, or state property, and thus the actions were clearly barred by T.C.A. § 20-13-102. In the instant case, the plaintiffs do not seek to reach the state treasury, funds, or property, and therefore, this case is distinguishable from the line of cases cited by the appellants.

In any event, we think our Supreme Court has clearly established that a plaintiff may maintain a declaratory judgment action challenging the constitutionality of a state statute. In *Leech v. American Booksellers Association*, 582 S.W.2d 738 (Tenn. 1979), the plaintiffs brought declaratory judgment actions challenging the constitutionality of the Tennessee Obscenity Act of 1978. Our Supreme Court, affirming the trial courts, held that the Act was unconstitutional. Although jurisdiction to entertain the cases was not raised, it is implicit from the Court's ruling that the Court has jurisdiction to consider a constitutional challenge to a state statute. Thus, under *Leech*, the plaintiffs in this

11

case may properly maintain a declaratory judgment action challenging the constitutionality of Tennessee's Homosexual Practices Act.

## II. The Statute of Limitations as a Bar to This Suit

We next address the appellants' assertion that this cause of action is barred by the statute of limitations. The appellants assert that the plaintiffs' cause of action is barred by T.C.A. § 28-3-104(a), the one year statute of limitations for personal torts and malpractice actions. The appellants argue that there must be a statute of limitations on the plaintiffs' cause of action, and since the action is closely analogous to the actions limited by § 28-3-104(a), the plaintiffs' suit is barred since it was commenced more than one year after the cause of action accrued.

The plaintiffs contend that this argument fails not only because the defendants have failed to cite a single case in support of this argument, but also because there is no statute of limitations on challenging an unconstitutional penal statute. We agree.

## III. Right to Privacy Under the Tennessee Constitution

The appellants argue that even if this Court does have jurisdiction to hear this case, the cause of action must fail, because the right to privacy under the Tennessee Constitution does not encompass the right to engage in homosexual conduct. In their brief and argument, the appellants rely heavily on the United States Supreme Court case of *Bowers v. Hardwick*, 478 U.S. 186, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986). In *Bowers*, respondent Michael Hardwick was charged with violating Georgia's sodomy statute[4] for committing that act with another

_____

[4]The statute provided in pertinent part:
"(a) A person commits the offense of sodomy when he performs or submits to any sexual act involving the sex organs of one person and the mouth or anus of another . . . .
(b) A person convicted of the offense of sodomy shall be punished by

12

male in Hardwick's bedroom. *Id.* at 2842. Hardwick was not prosecuted for violating the statute, but he felt that the statute placed him in "imminent danger of arrest." *Id.* Hardwick brought suit in federal district court to challenge the constitutionality of the statute asserting that the statute violated his fundamental right to privacy under the United States Constitution. The district court granted the defendant's motion to dismiss for failure to state a claim upon which relief can be granted. Id. The Court of Appeals for the Eleventh Circuit reversed, holding that the Georgia statute violated Hardwick's fundamental rights, because his sexual activity constituted private and intimate association that is beyond the reach of state regulation under the Ninth Amendment and the Due Process Clause of the Fourteenth Amendment. *Id.* at 2843. The United States Supreme Court granted *certiorari* and reversed the Eleventh Circuit, holding that Georgia's sodomy law did not violate Hardwick's federal constitutional rights. The Court held that the right to engage in homosexual conduct would not be afforded heightened judicial protection, because it does not fall into the category of a right which is "implicit in the concept of ordered liberty," *Id.* (quoting *Palko v. Connecticut*, 302 U.S. 319, 325, 326, 58 S.Ct. 149, 151, 152, 82 L.Ed. 288 (1937)), or "deeply rooted in this Nation's history and tradition," 106 S.Ct. at 2844 (quoting *Moore v. East Cleveland*, 431 U.S. 494, 503, 97 S.Ct. 1932, 1938, 52 L.Ed.2d 531 (1977)). The court reasoned that homosexuality was criminalized in this Nation as early as the adoption of the Bill of Rights, thus to argue that the right to engage in such conduct is "deeply rooted in this Nation's history" or "implicit in the concept of ordered liberty" is "facetious." 106 S.Ct at 2846.

––––––––––––––––––––

imprisonment for not less than one nor more than 20 years . . . . " Ga. Code Ann. § 16-6-2 (1984).

The appellants argue that the parameters of protection of the right to privacy under the Tennessee Constitution are identical to those of the Federal Constitution, and since the federal right to privacy does not encompass the right to engage in homosexual conduct, neither does the right to privacy under the Tennessee Constitution. The appellants argue that the "precise source of the state right to privacy" is found in Article I, Section 8 of the Tennessee Constitution,[5] and that Tennessee courts have consistently interpreted the protections afforded Tennessee citizens under Article I, Section 8 to be "substantially identical" or "synonymous" with the Due Process Clauses of the Fifth and Fourteenth Amendments to the United States Constitution.[6] The appellants assert that to date, our Supreme Court has interpreted the right to privacy under the Tennessee Constitution to guarantee Tennessee citizens only the same rights as the federal right to privacy (that is, rights in the areas of heterosexual marriage, procreation, and child rearing). Therefore, the right to privacy in Tennessee should continue to protect only those areas of conduct which are protected by the federal right to privacy. The appellants contend that since *Bowers* established that the federal right to privacy only protects those matters which are "deeply rooted in this Nation's history and tradition" or "implicit in the concept of ordered liberty," the Tennessee right to privacy similarly only protects those same matters. The appellants, tracking the language of the *Bowers* Court,

---

[5]Article I, Section 8 of the Tennessee Constitution provides:
Sec. 8. No man to be disturbed but by law.--That no man shall be taken or imprisoned, or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or in any manner destroyed or deprived of his life, liberty or property, but by the judgment of his peers or the law of the land.

[6]In support of this proposition, the appellants cite *Railroad v. Crider*, 91 Tenn 489, 501-02, 19 S.W. 618 (1892); *State v. Hale*, 840 S.W.2d 307, 312 (Tenn. 1992); *Dearborne v. State*, 575 S.W.2d 259, 262 (Tenn. 1978); *Daugherty v. State*, 216 Tenn. 666, 674, 393 S.W.2d 739, 743 (1965).

further argue that it is "facetious" to "claim that the right to engage in homosexual sodomy" is either implicit in this State's concept of ordered liberty or deeply rooted in this State's history and tradition.

The appellees, on the other hand, argue that since *Bowers* is analytically unsound, and the Tennessee Supreme Court has stated that "there is no reason to assume that there is a complete congruency" between the federal and Tennessee rights to privacy, *Davis v. Davis*, 842 S.W.2d 588 (Tenn. 1992), the Tennessee right to privacy does encompass the right of the plaintiffs to engage in private, consensual, non-commercial, sexual conduct. The appellees also argue that Tennessee constitutional jurisprudence and Tennesseans' historical hostility to excessive governmental interference in their personal lives, clearly provide a basis for concluding that the Tennessee right to privacy confers greater rights upon its citizens than does the corresponding federal right to privacy.

We note at the outset that in determining the parameters of the right to privacy under the Tennessee Constitution, neither this Court nor the Tennessee Supreme Court is bound by the United States Supreme Court's decision in *Bowers v. Hardwick*. It is settled constitutional law that where the Tennessee Constitution and the federal constitution contain similar or identical provisions, the Tennessee Supreme Court may "impose higher standards and stronger protection than those set by the federal constitution." *Miller v. State*, 584 S.W.2d 758, 760 (Tenn. 1979); *Leech v. American Booksellers Ass'n, Inc.*, 582 S.W.2d 738, 745 (Tenn. 1979). In *Miller*, our Supreme Court stated:

> [A]s to Tennessee's Constitution, we sit as a court of last resort, subject solely to the qualification that we may not impinge upon the minimum level of protection established by [United States] Supreme Court interpretations of the federal constitutional guarantees. But state supreme courts, interpreting

15

> state constitutional provisions, may impose higher standards and stronger protections than those set by the federal constitution. It is settled law that the Supreme Court of a state has full and final power to determine the constitutionality of a state statute, procedure, or course of conduct with regard to the state constitution, and this is true even where the state and federal constitutions contain similar or identical provisions.

*Miller*, 584 S.W.2d at 760 (citations omitted).

The right to privacy in Tennessee was first expressly recognized in Tennessee in 1992 in *Davis v. Davis*, 842 S.W.2d 588 (Tenn. 1992).[7] In *Davis* our Supreme Court was presented with the question of whether Junior Davis had a right to prevent his ex-wife, Mary Sue Davis, from donating "frozen embryos" to a childless couple. The "frozen embryos" were created from the sperm of Mr. Davis and the ova of Mrs. Davis and were originally intended to be implanted into the uterus of Mrs. Davis who was incapable of conceiving children otherwise. At some point the marital relations of the parties went awry, and following the parties divorce, they could not agree on the disposition of the frozen embryos. Mr. Davis argued that to allow Mrs. Davis to donate the embryos would in effect force him to become a father against his will. Our Supreme Court ruled that the Tennessee Constitution afforded Mr. Davis a right to privacy which included the right not to procreate. *Id.* at 601. The court stated,

> The right to privacy, or personal autonomy ("the right to be let alone"), while not mentioned explicitly in our state constitution, is nevertheless reflected in several sections of the Tennessee Declaration of Rights, including provisions in Section 3 guaranteeing

---

[7]Since *Davis*, the Supreme Court has dealt with the right to privacy in four cases all of which construed the right in the context of parental rights. *See Hawk v. Hawk*, 855 S.W.2d 573 (Tenn. 1993); *Broadwell by Broadwell v. Holmes*, 871 S.W.2d 471 (Tenn. 1994); *Nale v. Robertson*, 871 S.W.2d 674 (Tenn. 1994); *Simmons v. Simmons*, 900 S.W.2d 682 (Tenn. 1995).

freedom of worship ("no human authority can, in any case whatever, control or interfere with the rights of conscience"); those in Section 7 prohibiting unreasonable searches and seizures ("the people shall be secure in their persons, houses, papers, and possessions, from unreasonable searches and seizures"); those in Section 19 guaranteeing freedom of speech and press ("free communication of thoughts and opinions, is one of the invaluable rights of man, and every citizen may freely speak, write, and print on any subject, being responsible for the abuse of that liberty"); and the provisions in Section 27 regulating the quartering of soldiers ("no soldier shall, in time of peace, be quartered in any house without the consent of the owner").

Obviously, the drafters of the Tennessee Constitution of 1796 could not have anticipated the need to construe the liberty clauses of that document in terms of the choices flowing from *in vitro* fertilization procedures. But there can be little doubt that they foresaw the need to protect individuals from unwarranted governmental intrusion into matters such as the one now before us, involving intimate questions of personal and family concern. Based on both the language and the development of our state constitution, we have no hesitation in drawing the conclusion that there is a right of individual privacy guaranteed under and protected by the liberty clauses of the Tennessee Declaration of Rights.

Undoubtedly, that right to privacy incorporates some of the attributes of the federal constitutional right to privacy and, in any given fact situation, may also share some of its contours. As with other state constitutional rights having counterparts in the federal bill of rights, however, there is no reason to assume that there is a complete congruency. *Compare and contrast, e.g., State v. Jacumin*, 778 S.W.2d 430 (Tenn. 1989), with *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983).

*Davis*, 842 S.W.2d at 600.

As stated above, the appellants argue that the "precise source" of the right to privacy is Article I, Section 8 of the Tennessee Constitution, and that since Tennessee courts have interpreted Article I, Section 8 "synonymously" with the Federal Due Process Clauses, the right to privacy in Tennessee does not

encompass the right to engage in homosexual conduct. We disagree. Our Supreme Court has not stated that Article I, Section 8 is the precise source of the right to privacy, it has stated that the right to privacy is "ground[ed]" in the "concept of liberty" in our Constitution. *Davis*, 842 S.W.2d at 598; *Hawk v. Hawk*, 855 S.W.2d 573, 579 (Tenn. 1993). Article I, Section 8's "liberty" provision is certainly part of that "concept of liberty," and it protects and guarantees the right to privacy, but it is not the sole and precise source of the right to privacy. The *Davis* Court clearly stated that the textual sources of the right to privacy include Sections 3, 7, 19, and 27 of the Declaration of Rights contained in Article I. 842 S.W.2d at 600. Thus, the construction which the Supreme Court has placed on Article I, Section 8 does not restrict the right to privacy, because the right to privacy does not stem solely from Article I, Section 8. Moreover, the cases which the appellants have cited for the proposition that Article I, Section 8 is "synonymous" with the Due Process Clauses of the Federal Constitution overstates the holdings of these cases. These cases stated that the "law of the land" provision of Article I, Section 8 is "synonymous" with the Federal Due Process Clauses; the Courts did not purport to discuss the "liberty" component of the Section in the context of the right to privacy. *See Railroad v. Crider*, 91 Tenn 489, 501-02, 19 S.W. 618 (1892) (stating "law of the land" clause is "substantially identical" to Federal Due Process Clauses); *State v. Hale*, 840 S.W.2d 307, 312 (Tenn. 1992) ("law of the land" clause and "due process of law" clause used in the Fifth and Fourteenth Amendments "are synonymous phrases meaning one and the same thing"); *Dearborne v. State*, 575 S.W.2d 259, 262 (Tenn. 1978) (same); *Daugherty v. State*, 216 Tenn. 666, 674, 393 S.W.2d 739, 743 (1965) (same). In any event, *Davis v. Davis* clearly established that "there is no reason to assume that there is a complete congruency" between the Tennessee

18

and the federal right to privacy. 842 S.W. 2d at 600.

Both the Tennessee Constitution and this State's constitutional jurisprudence establish that the right to privacy provided to Tennesseans under our Constitution is in fact more extensive than the corresponding right to privacy provided by the Federal Constitution. We agree with the plaintiffs that the Tennessee Constitution and especially the Declaration of Rights in Article I, indicate a strong historic commitment by the citizens of this State to individual liberty and freedom from governmental interference in their personal lives. Our Supreme Court noted this commitment in *Davis*. The Court, commenting on Sections 1 and 2 of the Declaration of Rights,[8] stated,

> Indeed, the notion of individual liberty is so deeply imbedded in the Tennessee Constitution that it, alone among American constitutions, gives the people, in the face of governmental oppression and interference with liberty, the right to resist that oppression even to the extent of overthrowing the government.

842 S.W.2d at 599.

The Homosexual Practices Act prohibits sexual contact between individuals of the same gender regardless of the location of the contact. That is, as written, the statute is sufficiently broad to prohibit private sexual activity

---

[8]Section 1 and 2 of Article I provide as follows:

Section 1. All power inherent in the people--Government under their control. --That all power is inherent in the people, and all free governments are founded on their authority, and instituted for their peace, safety, and happiness; for the advancement of those ends they have at all times, an inalienable and indefeasible right to alter, reform, or abolish the government in such manner as they may think proper.

Section 2. Doctrine of nonresistance condemned. --That government being instituted for the common benefit, the doctrine of non-resistance against arbitrary power and oppression is absurd, slavish, and destructive of the good and happiness of mankind.

Tenn. Const. art I, §§ 1, 2.

19

which takes place behind closed doors in an individual's home.   The sanctity of

the home has long been recognized by both federal law and Tennessee law,[9]

and both bodies of law have drawn distinctions between actions which are

---

[9]Over seventy years ago, our Supreme Court stated,

> At the very foundation of our State is the right of people to be secure in their persons, houses, papers, and possessions. Infringement of such individual rights cannot be tolerated until we tire of democracy and are ready for communism or a despotism.   The enforcement of no statute is of sufficient importance to justify indifference to the basic principles of our government.  The better class of our ancestors at one time thought there could be no more heinous sin than questioning the divine right and will of the king.  Later the majority of them regarded all dealings with the exiled house of Stuart as calling for the most severe methods of repression, and many of a later generation believed that the libels of Wilkes and his associates upon the ministry were so dangerous to good order that they should be suppressed by any means. Likewise there was little general sympathy with the earlier violations of the imposts laws in the colonies.

> On these occasions the government proceeded with a heavy hand, and indiscriminate searches and seizures were made in the hunt for evidence upon which to try offenders.  There is little doubt but that at the beginning of each of these crises predominant moral sentiment supported the crown.  But violent methods outraged and antagonized the people, and either made impossible or postponed the end sought to be reached.  Much turmoil arose, much blood flowed, but little progress was made in law enforcement.  The observance of no law has been promoted by tyranny, nor do we suppose ever will be, in an English speaking community.

> These lessons from the past, as well as the Constitution which rules us all, admonish that this court should set itself unfalteringly against any disturbance of the security of the people in "their persons, houses, papers and possessions" by unreasonable searches and seizures.

*Craven v. State*, 148 Tenn. 517, 519-20, 256 S.W. 431 (1923).

20

committed in the privacy of the home and those committed in public.[10] We

think it is consistent with this State's Constitution and constitutional jurisprudence

to hold that an adult's right to engage in consensual and noncommercial sexual

activities in the privacy of that adult's home is a matter of intimate personal

concern which is at the heart of Tennessee's protection of the right to privacy,

and that this right should not be diminished or afforded less constitutional

protection when the adults engaging in that private activity are of the same

---

[10]In *Stanley v. Georgia*, 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969), the United States Supreme Court held that while the State of Georgia could criminalize the public dissemination of obscene material, it could not criminalize the private possession of obscene material. The court stated that the justifications for statutes regulating obscenity "do not . . . reach into the privacy of one's own home." *Id.* at 1248; *See also, Bowers v. Hardwick*, 106 S.Ct. at 2853 (Blackmun, J., dissenting) ("Indeed, the right of an individual to conduct intimate relationships in the intimacy of his or her own home seems to me to be the heart of the Constitution's protection of privacy.")

In *State v. Graham*, 35 Tenn. 133 (1855) our Supreme Court considered the propriety of a conviction for uttering profanity in public. The Court held that the public nature of the offense made it an indictable offense. The Court did not specifically address swearing in the context of the privacy of the home, but it did draw a distinction between acts which are committed in private and those which are committed in public and thereby become harmful and criminally punishable. The court stated:

> Sobriety in public, as laid down by Blackstone in his Commentary, is a duty every man owes to the community, and the violation of which is indictable. Not so as to private acts of drunkenness-- that is only hurtful to himself and not his neighbors.
>   The principle pervading all our laws, in relation to the description of offences under consideration, is, that, with the private views of citizens, the community, as such, will not concern itself, but leave them to the lash of conscience and the frowns of neighbors; but when their vicious acts are public, they will be dealt with as *crimes*, because of their tendency to disturb and annoy others, and exert a baneful influence upon the morals and habits of the community.

*Id.* at 138-39 (emphasis in original).

gender.[11]

Since we have determined that the Homosexual Practices Act constitutes a governmental intrusion into the plaintiffs' right to privacy, we must next address the question of whether this intrusion is unwarranted and therefore, unconstitutional. Since the right to privacy is protected by the Tennessee Constitution, it is therefore a fundamental right. *State v. Tester*, 879 S.W.2d 823, 828 (Tenn. 1994). Legislation which regulates the exercise of a fundamental right will be reviewed under a strict scrutiny analysis. *Hawk v. Hawk*, 855 S.W.2d 573, 579, 579 nn. 8, 9 (Tenn. 1993). To withstand strict scrutiny, the legislation must be justified by a "compelling state interest" and must be narrowly drawn to advance that interest. *Id.*

The appellants offer essentially five state interests that are allegedly advanced by the Homosexual Practices Act.[12] First, the Act discourages activities which cannot lead to procreation. Second, the Act discourages citizens from choosing a lifestyle which is socially stigmatized and leads to higher rates of suicide, depression, and drug and alcohol abuse. Third, the Act discourages homosexual relationships which are "short lived," shallow, and initiated for the purpose of sexual gratification. Fourth, the Act prevents the spread of infectious disease, and fifth, the Act promotes the moral values of Tennesseans.

None of the foregoing asserted State interests are sufficient to save the

---

[11]We express no opinion as to the constitutionality of the criminalization of the conduct at issue in this case when that conduct is engaged in publicly or commercially, nonconsensually, or by minors, as those questions are not before us and implicate State interests not presented by the instant case.

[12]The appellants make no argument as to whether these interests constitute "compelling interests" which justify the infringement of a fundamental right. The appellants simply offered these interests as justifications for the statute in their answers to plaintiffs' interrogatories.

Homosexual Practices Act under strict scrutiny analysis, because either the asserted interest is not a compelling one, or the Act is not narrowly drawn to advance that interest. The first asserted interest, that the statute discourages activity which cannot lead to procreation, is neither a compelling nor even a constitutionally valid justification for the Act. The United States Supreme Court's decision in *Griswold v. Connecticut*, 381 U.S. 479, 85 S.Ct. 1678, 35 L.Ed.2d 510 (1965), establishes that the State cannot outlaw certain intimate sexual activities of its citizens simply because those activities do not or cannot lead to procreation. Moreover, in *Davis v. Davis*, our Supreme Court unequivocally stated that the right to privacy includes the right to procreational autonomy which provides citizens of this state "the right to procreate and the right to avoid procreation." 842 S.W.2d at 601.

The second justification for the statute, that it discourages a socially stigmatized lifestyle which leads to higher rates of suicide, depression, and substance abuse, also fails to save the statute under strict scrutiny analysis. We think there is little doubt that the State's attempt to rescue homosexuals from a socially unpopular lifestyle does not provide a compelling reason or even a valid reason for infringement of the fundamental right of adults to engage in private, noncommercial, consensual sex. *See Palmore v. Sidoti*, 104 S.Ct. 1879, 1882 (1984) (Denying an individual a protected right simply because exercise of that right will result in subjecting individual to private prejudice and bias, operates to give the effect of the law to the prejudice and bias and is impermissible); *O'Connor v. Donaldson*, 422 U.S. 563, 575, 95 S.Ct. 2486, 2494, 45 L.Ed.2d 396 (1975)("Mere public intolerance or animosity cannot justify the deprivation of a person's physical liberty."). While we agree that the State has a compelling interest in preventing substance abuse and suicide among its

23

citizens, there is insufficient evidence in the record before us to demonstrate that the Homosexual Practices Act advances this interest. Moreover, even if we assume that the State can punish a "lifestyle," the record before us indicates that there is no one "homosexual lifestyle" in which all or even a majority of homosexuals engage; thus, with respect to this justification, the statute is overly broad by infringing upon the privacy rights of homosexuals who do not engage in a lifestyle encompassing alcoholism, drug abuse, and suicide.

The State's third justification for the statute is that it prevents homosexuals from entering into short lived, shallow, and promiscuous relationships which weaken the "fabric" of the  community at large. The appellants argue that homosexual relationships are instable and that this instability has consequences for others in society. We think this justification also fails to rescue the Homosexual Practices Act under strict scrutiny analysis, because there is insufficient evidence in the record to prove that homosexual relationships are short lived and shallow and thereby weaken the "fabric" of the community.[13]

The State's fourth asserted justification for the statute is that it prevents the spread of infectious disease. We agree that the State certainly has a compelling interest in preventing the spread of infectious disease among its citizens, however, the Homosexual Practices Act is not narrowly tailored to

---

[13] Justice Blackmun reached a similar conclusion in his dissent in *Bowers* in which he stated:

Nor can . . . [Georgia's sodomy statute] be justified as a[n] . . . exercise of Georgia's power to "protect the public environment," *Paris Adult Theatre I*, 413 U.S., at 68-69, 93 S.Ct., at 2641. Certainly, some private behavior can affect the fabric of society . . .  but we have ample evidence for believing that people will not abandon morality, will not think any better of murder, cruelty and dishonesty, merely because some private sexual practice which they abominate is not punished by the law."

*Bowers*, 106 S.Ct. at 2855 (Blackmun, J., dissenting) (citations omitted).

advance this interest. The statute prohibits all sexual contact between people of the same gender even if the people involved are disease free, practicing "safe sex," or engaging in sexual contact which does not contribute to the spread of disease.[14] Moreover, the appellees and the American Public Health Association, as *amicus curiae*, forward a compelling argument that the statute is actually counterproductive to public health goals. The appellees introduced evidence that due to fear of prosecution, some homosexual individuals infected with sexually transmitted diseases do not seek medical treatment for the infection or report the infection, and that others are reluctant to be tested to determine if they are infected.

The final asserted justification for the Homosexual Practices Act is that the Act advances the morals of Tennessee citizens. The appellants assert that by criminalizing homosexual acts, the citizens of this State, through their elected representatives, have indicated that they "find the practice of homosexuality offensive and violative of their own moral standards, whether those standards are founded in religious conviction or are derived from a system of secular moral philosophy." The appellants argue that it is axiomatic that our State's laws may constitutionally reflect the moral values and standards of its citizens and may prohibit conduct which is violative of those moral values and standards.[15] In

---

[14]We also note that T.C.A. § 68-10-107 (1992) serves to prevent the spread of infectious diseases by criminalizing the transmission of a sexually transmitted disease.

[15] In the Defendants' Responses to Plaintiffs' First Set of Interrogatories, the defendants assert as a justification for the Homosexual Practices Act, the following:

Government often takes steps to protect its citizens from participating in activities that will injure them or their families and loved ones. Many current Tennessee statutes are designed to do just this. For example, the blue laws, pornography laws, gambling laws and prostitution laws are all designed to

25

support of this proposition, the appellants cite to the majority opinion in *Bowers*, in which the Court stated, "[t]he law . . . is constantly based on notions of morality, and if all laws representing essentially moral choices are to be invalidated under the Due Process Clause, the courts will be very busy indeed." *Bowers*, 478 U.S. at 196, 106 S.Ct. at 2846.

The appellees, on the other hand, argue that the moral values of Tennessee citizens are unsubstantiated by the record in this case, and in any event, majoritarian morality is not a valid basis for curtailing the actions of an unpopular minority in the absence of any evidence that the actions of the minority harm other members of society. In support of this proposition the appellees cite to *Wisconsin v. Yoder*, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972), in which the United States Supreme Court stated, "A way of life that is odd or even erratic, but interferes with no rights or interests of others, is not to be condemned because it is different." *Yoder*, 406 U.S. at 223-24, 92 S.Ct at 1537. The appellees also quote the majority opinion in *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), in which the Court stated that the Constitution "is made for people of fundamentally differing views, and the accident of our finding certain opinions natural and familiar, or novel, and even shocking ought not to conclude our judgment upon the question of whether statutes embodying them conflict with the Constitution of the United States." *Roe*, 410 U.S. at 113, 93 S.Ct. at 709 (quoting *Lochner v. New York*, 198 U.S. 45, 76, 25 S.Ct.

---

penalize certain activities solely because the citizens of this State have a moral conviction that engaging in these activities will be injurious in some manner and will produce one or more undesirable social conditions. The statutory grounds set out for obtaining a divorce in Tennessee also demonstrate moral choices that the citizens of this State have translated into legislation. The Homosexual Acts statute is just one example in a long litany of statutes the purpose of which is to reinforce certain moral values and to minimize harmful social conditions.

539, 547, 49 L.Ed. 937 (1905) (Holmes, J., dissenting)).

In reviewing these arguments we note that the propriety of the infusion of majoritarian morality into our laws has been debated since the inception of this Nation, and this debate has resulted in judicial conclusions that are as vastly different as the contexts in which these debates have arisen. In this case, both the appellants and the appellees present compelling arguments regarding the extent to which our laws may reflect majoritarian morality. We recognize that many of the laws of this State reflect "moral choices" regarding the standard of conduct by which the citizens of this State must conduct themselves. However, we also recognize that when these "moral choices" are transformed into law, they have constitutional limits. In this case, since the law in question infringes upon the plaintiffs' right to privacy, a fundamental right, the law must be justified by a compelling state interest and must be narrowly drawn to advance that interest. Even if we assume that the Homosexual Practices Act represents a moral choice of the people of this State, we are unconvinced that the advancement of this moral choice is so compelling as to justify the regulation of private, noncommercial, sexual choices between consenting adults simply because those adults happen to be of the same gender.

Our neighboring state, Kentucky, among other states, has reached a similar conclusion. In *Commonwealth v. Wasson*, 842 S.W.2d 487 (Ky. 1992), the Supreme Court of Kentucky considered the propriety of upholding a statute similar to T.C.A. § 39-13-510, on the basis of advancing the morals of Kentuckians. The court concluded that the will of the majority could not be imposed upon the minority absent some showing of harmful consequences created by the actions of the minority. *Wasson*, 842 S.W.2d 496-97. The court stated,

27

It may be asked whether a majority, believing its own happiness will be enhanced by another's conformity, may not enforce its moral code upon all. The answer is that, first, morality is an individual, personal - one might say, private - matter of conscience, and dwells inviolate within the fortress of Section 5: "No human authority shall in any case whatever, control or interfere with rights of conscience." Second, the Constitution promotes no particular morality, however popular. Indeed, the New World having been sought out by those fleeing state and/or majoritarian persecution, our systems of government are predicated upon such imperatives as that recognized in Kentucky Constitution Section 2: "Absolute and arbitrary power over the lives, liberty and property of freemen exist nowhere in a republic, not even in the largest majority." Third, morality is a matter of values. Insofar as it comprises a moral code, the Constitution embraces - yea, embodies - immutable values of individual freedom, liberty, and equality.

*Wasson*, 842 S.W.2d at 502-03 (Combs, J., concurring). The *Wasson* court found the Pennsylvania Supreme Court's holding in *Commonwealth v. Bonadio*, 415 A.2d 47 (Penn. 1980), persuasive. In *Bonadio*, the Pennsylvania Supreme Court also considered the issue of upholding its sodomy statute on the basis of morals and the state's police powers; the court stated:

The threshold question in determining whether the statute in question is a valid exercise of the police power is to decide whether it benefits the public generally. The state clearly has a proper role to perform in protecting the public from inadvertent offensive displays of sexual behavior, in preventing people from being forced against their will to submit to sexual contact, in protecting minors from being sexually used by adults, and in eliminating cruelty to animals. To assure these protections, a broad range of criminal statutes constitute valid police power exercises, including proscriptions of indecent exposure, open lewdness, rape, involuntary deviate sexual intercourse, indecent assault, statutory rape, corruption of minors, and cruelty to animals. The statute in question serves none of the foregoing purposes and it is nugatory to suggest that it promotes a state interest in the institution of marriage. The Voluntary Deviate Sexual Intercourse Statute has only one possible purpose: to regulate the private conduct of consenting adults. . . .

> With respect to regulation of morals, the police power should properly be exercised to protect each individual's right to be free from interference in defining and pursuing his own morality but not to enforce a majority morality on persons whose conduct does not harm others. "No harm to the secular interests of the community is involved in atypical sex practice in private between consenting adult partners." MODEL PENAL CODE § 207.5 - Sodomy & Related Offenses. Comment (Tent. Draft No. 4, 1955). Many issues that are considered to be matters of morals are subject to debate, and no sufficient state interest justifies legislation of norms simply because a particular belief is followed by a number of people, or even a majority. Indeed, what is considered to be "moral" changes with the times and is dependent upon societal background. Spiritual leadership, not the government, has the responsibility for striving to improve the morality of individuals. Enactment of the Voluntary Deviate Sexual Intercourse Statute, despite the fact that it provides punishment for what many believe to be abhorrent crimes against nature and perceived sins against God, is not properly in the realm of the temporal police power.

*Bonadio*, 415 A.2d at 49-50.

This Court has previously observed: "This Court does not sit as moral arbiters making judgments on what is acceptable social behavior." *In re Parsons*, C.A. No. 02A01-9403-JV-00037, 1995 WL 442587, at *5 (Tenn. Ct. App. W.S. July 27, 1995). The Court must scrupulously avoid imposing the moral beliefs of its members on anyone. The Court's opinion should not in any way be deemed to condone or condemn any particular lifestyle or the moral behavior associated therewith. The Court's role is to see that the liberty of our citizens is fully protected to the extent authorized by our Constitution and laws.

Pursuant to this state's constitution and constitutional jurisprudence, we conclude that our citizens' fundamental right to privacy ("the right to be let alone") encompasses the right of the plaintiffs to engage in consensual, private, non-commercial, sexual conduct, because that activity "involv[es] intimate

29

questions of personal and family concern."  Therefore, we hold that the Homosexual Practices Act, T.C.A. § 39-13-510, which criminalizes such conduct, is unconstitutional.

Finally, we reach the appellees argument that because the HPA is unconstitutional, an injunction should be issued against its enforcement.  It is clear that this Court may not enjoin pending or threatened prosecutions for the violation of the criminal laws of this State.  *Erwin Billiard Parlor v. Buckner*, 156 Tenn. 278, 300 S.W. 565 (1927); *Lindsey v. Drane*, 154 Tenn. 458, 285 S.W. 705 (1926); *Brackner v. Estes*, 698 S.W.2d 637 (Tenn. App. 1985).  This argument is without merit.

Accordingly, the judgment of the trial court is affirmed.  Costs of appeal are assessed against appellants.

_____
W. FRANK CRAWFORD,
PRESIDING JUDGE, W.S.

CONCUR:


_____
DAVID R. FARMER, JUDGE


BEN H. CANTRELL, JUDGE,
PARTIAL DISSENT IN SEPARATE
OPINION