# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
### May 21, 2014 Session

## LISA HOWE, ET AL. v. BILL HASLAM

**Direct Appeal from the Chancery Court for Davidson County**
**No. 11-778-II     Carol L. McCoy, Judge**

---

**No. M2013-01790-COA-R3-CV - Filed November 4, 2014**

---

Plaintiffs allege that a 2011 act of the General Assembly adding a definition of "sex" to the Tennessee Human Rights Act and creating the Equal Access to Intrastate Commerce Act, now codified at Tennessee Code Annotated § 7-51-1801(1) & (2), violates the Equal Protection guarantees of the United States and Tennessee Constitutions. The trial court dismissed the action for lack of standing. We dismiss the claims of Plaintiffs Wesley Roberts and the Gay/Straight Alliance of Hume-Fogg Academic Magnet High School as moot where the Defendant Governor concedes that the Equal Access to Intrastate Commerce Act does not apply to Local Education Agencies or Tennessee schools. We affirm dismissal of the remaining Plaintiffs for lack of standing where they have failed to allege a discrete, palpable, cognizable injury in fact.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed and Remanded

DAVID R. FARMER, J., delivered the opinion of the Court. J. STEVEN STAFFORD, J., filed a concurring opinion. W. NEAL MCBRAYER, J., filed a concurring in part opinion.

Abby R. Rubenfeld, Nashville, Tennessee; Shannon P. Minter, Christopher F. Stoll and Amy Whelan, San Francisco, California; and James E. Hough, Leah Ramos and Katie L. Viggiani, New York, New York, for the appellants, Lisa Howe, Erica Gilmore, Marisa Richmond, Wesley Roberts, Gay/Straight Alliance of Hume-Fogg Academic Magnet High School, The Tennessee Equality Project, and The Tennessee Transgender Political Coalition.

Robert E. Cooper, Jr., Attorney General and Reporter, Joseph F. Whalen, Action Solicitor General and William J. Marett, Jr., Senior Counsel, for the appellee, Bill Haslam, as Governor of the State of Tennessee, in his official capacity.

**OPINION**

This appeal arises from a June 2011 action challenging the constitutionality of chapter 278 of the 2011 Public Acts, House Bill 600/Senate Bill 632 (hereinafter "HB600"), on the ground that it violates the equal protection guarantees of the Tennessee and United States Constitutions. In April 2011, the Council of the Metropolitan Government of Nashville and Davidson County ("Metro Council") amended chapter 4.28 of the Metropolitan Code in response, according to the preamble of the amendment, to "recent events concerning the employment practices of a particular Metropolitan Government Contractor." The amendment added "gender identity" and "sexual orientation" to the classes of persons protected by the equal opportunity provisions applicable to government contractors.[1] HB600 was introduced

_____

[1]As amended by Ordinance No. BL2011-838, which was introduced in January 2011 and approved on April 8, 2011, Chapter 4.28.010 of the Metropolitan Code of the Metropolitan Government of Nashville and Davidson County provided, in pertinent part:

> A. It is declared to be the policy of the metropolitan government that any person contracting for building and construction projects or furnishing supplies or services to the metropolitan government, and to which any funds of the metropolitan government are expended, shall establish equal employment opportunities for all individuals so that no individual shall be excluded from employment by such person because of race, creed, color, national origin, age, sex, gender identity, or sexual orientation, and to ensure compliance with all applicable laws concerning the employment of individuals with disabilities.
> B. Any person so contracting for building and construction projects, or furnishing supplies or services to the metropolitan government, wherein any funds of the metropolitan government may be appropriated or expended to such person, shall not subscribe to any personnel policy which permits or allows the promotion, demotion, employment, dismissal or laying off of any individual due to his race, creed, color, national origin, age sex, gender identity, or sexual orientation, or which is in violation of applicable laws concerning the employment of individuals with disabilities.
> C. It is further declared to be the policy of the metropolitan government that any person entering into any agreement for the use of any metropolitan government property or facility with a lease term of greater than six months shall establish equal employment opportunities for all individuals so that no individual shall be excluded from employment, discharged, demoted, or refused a promotion by such person because of race, creed, color, national origin, age, sex, gender identity, or sexual orientation, and to ensure compliance with all applicable laws concerning the employment of individuals with disabilities.
> D. The foregoing provisions of this section prohibiting employment discrimination on the basis of sexual orientation or gender identity are not intended to interfere with the free exercise of religion or the freedom of expressive association guaranteed by the U.S. Constitution. Religious entities, organizations, or institutions shall be expressly exempt from the provisions of this section prohibiting discrimination on the basis of sexual orientation or gender identity if such actions are in furtherance of the organization's religious mission or beliefs. Further, the provisions of this section prohibiting discrimination on the basis of

(continued...)

in February 2011 and approved in May 2011. Entitled "the Equal Access to Intrastate Commerce Act," HB600 amended the Tennessee Human Rights Act ("THRA") to add that "'[s]ex' means and refers only to the designation of an individual person as male or female as indicated on the individual's birth certificate." Now codified at Tennessee Code Annotated § 4-21-102(20) (2011), the amendment to the THRA became effective May 23, 2011. HB600 also added part 18 to chapter 51 (entitled "Local Government Functions") of Title 7 (entitled "Consolidated Governments and Local Governmental Functions and Entities"). Effective May 23, 2011, current section 7-51-1801 *et. seq.* is entitled the "Equal Access to Intrastate Commerce Act." Section 7-51-1801 defines "county" as including "any county having a metropolitan form of government" and defines "local government" to mean "a municipality or county." Tenn. Code Ann. § 7-51-1801(1) & (2)(2011). That part of section 7-51-1802 created by HB600 provides:

> (a)(1) No local government shall by ordinance, resolution, or any other means impose on or make applicable to any person an anti-discrimination practice, standard, definition, or provision that shall deviate from, modify, supplement, add to, change, or vary in any manner from:
>> (A) The definition of "discriminatory practices" in § 4-21-102 or deviate from, modify, supplement, add to, change, or vary any term used in such definition and also as defined in such section; or
>> (B) Other types of discrimination recognized by state law but only to the extent recognized by the state.
> (2) Any such practice, standard, definition, or provision imposed or made applicable to any person by a local government prior to May 23, 2011, shall be null and void.
> (b) Subsection (a) shall not apply with respect to employees of a local government.

Tenn. Code Ann. § 7-51-1802(2011).

---

[1](...continued)
sexual orientation or gender identity shall not apply to a group or organization if the application of such provision would significantly burden the expression of the group or organization.

available at http://www.nashville.gov/mc/ordinances/term_2007_2011/bl2011_838.htm

On June 13, 2011, Lisa Howe (Ms. Howe), Erik Cole (Mr. Cole), Erica Gilmore (Ms. Gilmore), Mike Jameson (Mr. Jameson), Shirit Pankowsky (Ms. Pankowsky), Marisa Richmond, Ph. D. (Dr. Richmond), The Tennessee Equality Project ("the TEP") and The Tennessee Transgender Political Coalition ("the TTPC"; collectively, "Plaintiffs") filed a complaint for declaratory and injunctive relief in the Chancery Court for Davidson County. In their complaint, Plaintiffs alleged that HB600 nullified existing local ordinances and policies prohibiting discrimination based on sexual orientation, gender identity, or any basis or disability not specified by state law, and that it prohibited the future enactment of local laws or policies. They alleged that HB600 was enacted, in part, in response to a 2011 amendment to Nashville ordinances that added prohibitions against discrimination on the basis of sexual orientation or gender identity to the city's anti-discrimination ordinances applicable to contractors doing business with the Metropolitan Government. They further alleged that the stated purpose of HB600, to streamline business regulation, was a "mere pretext" and that the "timing, context, history, and other statements by the bill's supporters and proponents overwhelmingly demonstrate[d] that . . . the actual purpose was to prevent the enactment of local laws protecting gay or transgender people." Plaintiffs asserted that HB600 stripped gay and transgender students of protection under anti-bullying school policies; that it removed existing protections afforded to gay and transgender persons; that it "deprive[d] gay and transgender Tennesseans of the right they previously [] enjoyed to seek redress from their local governments from even the most blatant forms of discrimination based on sexual orientation and gender identity"; and that it imposes a "special disability" on gay and transgender persons "by hampering their ability to seek aid from their local governments." Plaintiffs asserted HB600 "render[ed] futile" efforts to advocate for gay and transgender students or for students having a disability not specifically protected under state law. Plaintiffs submitted that HB600 "imposes a different and more burdensome political process on gay and transgender people than on non-gay and non-transgender people who have state protection against identity-based discrimination." They sought a declaration that HB600 violated federal and Tennessee equal protection guarantees, a permanent injunction against enforcement, and a ruling that any local or municipal ordinance, regulation or code struck down by HB600 remain in effect. Plaintiffs also sought costs and reasonable attorneys' fees.

Defendant Governor Bill Haslam (hereinafter, "the Governor") answered in July 2011 and generally denied Plaintiffs' allegations of unconstitutionality or improper motive or intent, denied that HB600 applied to Local Education Agencies or that it affected school anti-discrimination or anti-bullying policies, and denied that it deprived any person of any existing legal protection against discrimination. The Governor asserted that Plaintiffs lacked standing to prosecute the claims asserted; that they failed to set forth an actual case or controversy; that the claims asserted were moot or unripe; that Plaintiffs had failed to allege a distinct or palpable injury; that the Governor was not a proper party Defendant; and that

Plaintiffs had failed to state a claim. Following discovery and disputes regarding subpoenas issued to non-parties and motions to quash those subpoenas, in October 2011 Plaintiffs moved the trial court to enforce the subpoenas. By order entered January 25, 2012, the trial court determined that the action "constitute[d] a request for an advisory opinion[,]" that it was not ripe for review, and that "[n]o party ha[d] claimed an injury beyond potential discrimination, and potential loss of political and litigious opportunities." The trial court concluded that no "justiciable injuries" had been alleged.

In March 2012, Plaintiffs filed a motion for relief from the trial court's January order.[2] On June 14, 2012, Plaintiffs moved to amend their complaint to add additional plaintiffs and remove others. Plaintiffs moved to remove Mr. Cole and Mr. Jameson as Plaintiffs where their standing was predicated on their status as elected members of the Metro Council and where they no longer served on the Council. They also moved to remove Ms. Pankowsky, who had successfully graduated from high school and was no longer a student in the Nashville and Davidson County Schools. Plaintiffs moved to add the Gay/Straight Alliance of Hume-Fogg Academic Magnet High School ("GSA-HFA") as an organizational Plaintiff. Following a hearing on June 15, 2012, the trial court denied Plaintiffs' motion for relief from its January judgment by order entered June 25. In its order, the trial court found that none of the Plaintiffs had "alleged an injury-in-fact cognizable by law." The trial court also determined that none of the Plaintiffs had "stated a claim that is ripe for review[,]" and that they had "fail[ed] to state valid claims" under the Equal Protection Clause of the 14th Amendment to the United States Constitution.

Plaintiffs filed a notice of appeal to this Court. Following oral argument in June 2013, we determined that the trial court's June 2012 judgment was not final where Plaintiffs' motion to amend their complaint had not been adjudicated. *Howe v. Haslam*, No. M2012–01444–COA–R3–CV, 2013 WL 3326647 (Tenn. Ct. App. June 26, 2013) ("*Howe I*"). We accordingly dismissed the appeal and remanded the matter to the trial court for further proceedings. *Id.* at *7.

On July 15, 2013, Plaintiffs filed an amended motion to amend their complaint to remove Mr. Cole, Mr. Jameson and Ms. Pankowsky as Plaintiffs, and to add GSA-HFA as an organizational Plaintiff. Plaintiffs also moved to add Wesley Roberts (Mr. Roberts), a teacher at Hume-Fogg Academic Magnet High School, as a Plaintiff. The Governor filed a response in opposition to Plaintiffs' motion to amend on July 15 and Plaintiffs filed a proposed amended complaint on July 23, 2013. Following a hearing on July 19, by order

---

[2] In its January 2012 order, the trial court granted the parties 30 days in which to seek relief. On February 10, 2012, it entered an agreed order granting Plaintiffs an additional 30 days within which to file a motion for relief.

entered on July 30, 2013, the trial court granted Plaintiffs' motion to amend and ordered their proposed amended complaint deemed filed as of the date of the order. Following review of Plaintiffs' amended complaint, the trial court determined that Plaintiffs had "fail[ed] to allege any cognizable injury to any of the Plaintiffs." The trial court also determined that Plaintiffs' claims were not ripe for review. The trial court dismissed all claims on the basis of standing and ripeness, and ordered that any matters not specifically addressed were denied and dismissed. Ms. Howe, Ms. Gilmore, Ms. Richmond, Mr. Roberts, the GSA-HFA, the TEP, and the TTPC (hereinafter, collectively, "Appellants") filed a timely notice of appeal and oral argument was heard by the Western Section of this Court sitting in Nashville in May 2014.

### Issues Presented

The following issues, as stated by Appellants, are presented for our review:

1.  Whether the trial court erred when it held that Plaintiffs lacked standing to bring this equal protection challenge to Tennessee's Equal Access to Intrastate Commerce Act ("HB600") based on its conclusion that the following injuries to Plaintiffs, specifically alleged in the First Amended Complaint, were insufficient to create a justiciable controversy: (a) HB600 unconstitutionally distorts governmental processes in such a way as to place special burdens on the ability of a minority group - specifically, lesbian, gay, bisexual, and transgender (LGBT) persons - to achieve beneficial local legislation protecting that group against discrimination; (b) HB600 stripped the LGBT Plaintiffs of antidiscrimination protections previously available to them under state and/or local law or local school policies; (c) HB600 exposes the LGBT Plaintiffs to an immediate and substantial increased risk of discrimination; (d) HB600 injures the transgender Plaintiffs by unconstitutionally depriving them of protections against sex discrimination that are available to all other citizens under the Tennessee Human Rights Act; and (e) HB600 impermissibly impedes the effectiveness of Plaintiff Gilmore's legislative powers as a member of the Nashville Metropolitan Council.

2.  Whether the trial court erred when it held that Plaintiffs' claims are not ripe for review despite Plaintiffs' specific allegations of present, ongoing injury.

The question presented by this appeal, as we perceive and re-state it, is whether the trial court erred by determining that Appellants failed to allege any definite, palpable, cognizable injury-in-fact sufficient to confer standing.

### *Procedural Background*

The trial court determined that no justiciable case or controversy existed in this action where Appellants failed to assert any "cognizable injury," and accordingly lacked standing, and where Appellants' claims were not ripe for review. The record transmitted to us on appeal does not contain transcripts of the hearings held in the trial court. We also observe that, although standing was among the defenses asserted by the Governor in his answer, the Governor filed neither a motion to dismiss nor a motion for summary judgment in the trial court. Rather, in January 2012, the trial court appears to have determined that Appellants lacked standing and that their claims were not ripe for review following an October 2011 hearing on various discovery motions. Issues of standing and ripeness were first briefed by the parties in March 2012, when the original Plaintiffs filed their motion for relief from the trial court's January 2012 order. The trial court made no findings with respect to either the individual or organizational claimants but, as we observed in *Howe I*, essentially resolved this matter for failure to state a claim. *Howe I*, 2013 WL 3326647, at *1 n.1. Accordingly, the facts asserted in Appellants' complaint must be considered true for the purposes of this appeal. *Id.* (citing *see Webb v. Nashville Area Habitat for Humanity, Inc.*, 346 S.W.3d 422, 426 (Tenn. 2011)).

For the purposes of our review of a trial court's dismissal for failure to state a claim, we must determine whether, construing the complaint liberally, the plaintiff has alleged facts warranting relief. *Highwood Properties, Inc. v. City of Memphis*, 297 S.W.3d 695, 700 (Tenn. 2009) (citations omitted). We must determine whether, considering all "relevant and material allegations in the complaint" to be true, the allegations "constitute a cause of action." *Id.* We review the trial court's decision to dismiss a matter for failure to state a claim *de novo* with no presumption of correctness. *Id.*

### *Justiciability Doctrines*

The doctrines of ripeness and standing in Tennessee jurisprudence arise from the separation of powers of the branches of government imposed by Article II, Sections 1 and 2 of the Tennessee Constitution. *Norma Faye Pyles Lynch Family Purpose LLC v. Putnam County*, 301 S.W.3d 196, 202 (Tenn. 2009). Although the Tennessee Constitution does not expressly delineate the powers of the executive, legislative, or judicial branches of government or, unlike Article III of the United States Constitution, confine the jurisdiction

of the courts to "cases" and "controversies," Tennessee courts "have, since the earliest days of statehood, recognized and followed self-imposed rules to promote judicial restraint and to provide criteria for determining whether the courts should hear and decide a particular case." *Id.* In order to adhere to the long-standing judicial philosophy that "'the province of a court is to decide, not advise, and to settle rights, not to give abstract opinions[,]'" *Id.* at 203 (quoting *State v. Wilson*, 70 Tenn. 204, 210 (1879); *see also Gilreath v. Gilliland*, 95 Tenn. 383, 385–86, 32 S.W. 250, 251 (1895); *Prichitt v. Kirkman*, 2 Tenn. Ch. 390, 393 (1875)), the courts have employed the doctrines of standing, ripeness, mootness, political question, exhaustion of administrative remedies, and the prohibition against advisory opinions. *Id.* at 203. These justiciability doctrines are founded in our understanding of the role of the judiciary and our respect for the separation of powers provisions of the Tennessee Constitution. *Id.* at 202-03. It is well settled that the role of the courts is to decide and settle "legal controversies," not to advise or opine on abstract, theoretical questions. *Id.* at 203. A legal controversy exists "when the disputed issue is real and existing." *Id.* Constitutional differences notwithstanding, the Tennessee justiciability doctrines "mirror the justiciability doctrines employed by the United States Supreme Court and the federal courts" acting under the limitations imposed by Article III of the United States Constitution. *Id.* at 203. Thus, federal jurisprudence is instructive to our consideration of justiciability questions. *Id.* n.3.

Under the ripeness doctrine, the court must determine "'whether the harm asserted has matured sufficiently to warrant judicial intervention[.]'" *American Civil Liberties Union of Tennessee v. Darnell*, 195 S.W.3d 612, 620 n.7 (Tenn. 2006) (quoting *Warth v. Seldin*, 422 U.S. 490, 499 n.10, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975)). "The central concern of the ripeness doctrine is whether the case involves uncertain or contingent future events that may or may not occur as anticipated or, indeed, may not occur at all." *B & B Enterprises of Wilson County, LLC v. City of Lebanon*, 318 S.W.3d 839, 848 (Tenn. 2010) (citation omitted). The determination of whether a dispute is ripe for review requires a two-part inquiry. First, the court must determine whether the issues presented in the action are appropriate for judicial resolution. *Id.* Second, the court must determine whether its refusal to act will result in hardship to the parties. *Id.* The court will decline to act absent a need to act or if dismissal of the claim will not prevent the parties from asserting it at a more appropriate juncture. *Id.* (citations omitted). In a declaratory judgment action, a present injury is not required but an actual "case or controversy" must nevertheless exist. *Colonial Pipeline Co. v. Morgan*, 263 S.W.3d 827, 837–38 (Tenn. 2008). A declaratory judgment action may be dismissed for lack of ripeness. *Id.*

Standing is composed of two categories: constitutional standing and non-constitutional standing. *City of Memphis v. Hargett*, 414 S.W.3d 88, 98 (Tenn. 2013). The focus of non-constitutional standing is on judicial restraint, including consideration of whether an action raises questions more properly considered by another branch of

government. *Id.* Constitutional standing, which is the issue presented by the current matter, "is one of the 'irreducible . . . minimum' requirements that a party must meet in order to present a justiciable controversy." *Id.* (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992); citing *see also City of Chattanooga v. Davis*, 54 S.W.3d 248, 280 (Tenn. 2001); *Norma Faye Pyles Lynch Family Purpose LLC*, 301 S.W.3d 196, 202–03 (Tenn. 2009)(noting that Tennessee courts' adoption of the various justiciability doctrines, including standing, has a basis in the separation of powers required under Article II, Sections 1 and 2 of the Tennessee Constitution)).

The courts utilize the doctrine of standing to determine whether a plaintiff is "'properly situated to prosecute the action.'" *Petty v. Daimler/Chrysler Corp.*, 91 S.W.3d 765, 767 (Tenn. Ct. App. 2002) (quoting *Knierim v. Leatherwood*, 542 S.W.2d 806, 808 (Tenn. 1976)). A standing inquiry focuses on the parties, not the merits of the case. *Id.* at 768 (citation omitted). The doctrine "precludes courts from adjudicating 'an action at the instance of one whose rights have not been invaded or infringed.'" *Darnell*, 195 S.W.3d at 619-20 (quoting *Mayhew v. Wilder*, 46 S.W.3d 760, 767 (Tenn. Ct. App. 2001), *perm. app. denied* (Tenn. April 30, 2001)). "[T]he irreducible constitutional minimum of standing" includes three elements. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 2136 (1992). First, the plaintiff must demonstrate an injury in fact, which is "an invasion of a legally protected interest which is (a) concrete and particularized . . . and (b) actual or imminent, not conjectural or hypothetical." *Id.* (internal citations omitted). The injury must be distinct and palpable and may not be "predicated upon an injury to an interest that the plaintiff shares in common with all other citizens." *American Civil Liberties Union of Tennessee v. Darnell*, 195 S.W.3d 612, 620 (Tenn. 2006)(citations omitted). Second, a causal connection must exist between that injury and the conduct that is complained of. *Id.* While the causation element is not onerous, it does require a showing that the injury to a plaintiff is "fairly traceable" to the conduct of the adverse party. *Id.* (quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342, 126 S.Ct. 1854, 164 L.Ed.2d 589 (2006)). Third, the plaintiff must show that a favorable decision is capable of redressing the injury alleged. *Id.* The plaintiff must establish these elements "'by the same degree of evidence' as other matters on which the plaintiff bears the burden of proof." *Id.* (quoting *Petty v. Daimler/Chrysler Corp.*, 91 S.W.3d 765, 767 (Tenn. Ct. App.2002), *perm. app. denied* (Tenn. Sept. 9, 2002)). Standing is indispensable to a plaintiff's claim. *Daimler/Chrysler Corp.*, 91 S.W.3d at 767. Because standing generally depends on the nature of the asserted claims, the determination of whether a plaintiff has standing requires the court to carefully examine the allegations asserted in the complaint to determine whether a particular plaintiff is entitled to an adjudication of those claims. *Id.* at 768. (citations omitted).

To demonstrate standing as an organizational plaintiff, the organizational plaintiff

must establish that: "(1) its members would otherwise have standing to sue in their own right; (2) the interests it seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted, nor the relief requested, requires the participation of individual members in the lawsuit." *Darnell*, 195 S.W.3d at 626 (citations omitted).

We additionally note that Tennessee has not adopted a "public rights" exception to the requirement of standing. *City of Chattanooga v. Davis*, 54 S.W.3d 248, 280-81 (Tenn. 2001). In *Davis*, the supreme court observed that some jurisdictions have abrogated the injury requirement of standing when the action involves a constitutional question of "great public importance." *Id*. at 280 (citing *see State ex rel. Ohio Academy of Trial Lawyers v. Sheward*, 86 Ohio St.3d 451, 715 N.E.2d 1062, 1104 (1999); *see also State ex rel. Sego v. Kirkpatrick*, 86 N.M. 359, 524 P.2d 975, 979 (1974); *Jenkins v. State* 585 P.2d 442, 443 (Utah 1978)). Noting that "adherence to the particularized injury requirement of the standing doctrine" had been criticized "as being inadequate in a time when the courts are believed to have 'a special function with regard to the Constitution as its 'final authoritative interpreter,'" *Id*. (quoting *Constitutional Adjudication, The Who and the When*, 82 Yale L.J. 1363, 1366 (1973)), the supreme court nevertheless has not abrogated the requirement in Tennessee state actions regardless of whether a challenged action is most likely unconstitutional. *Id*.

As noted above, although the trial court dismissed this action based on the lack of standing and ripeness, its judgment was predicated on its conclusion that Appellants had failed to assert any "cognizable injury" in their complaint. Our supreme court has observed that the question of standing "'bears close affinity to questions of ripeness.'" *Darnell*, 195 S.W.3d at 620 n.7 (quoting *Warth v. Seldin*, 422 U.S. 490, 499 n.10, 95 S.Ct. 2197 (1975)). In some cases, moreover, the question of standing and ripeness "boil down to the same question." *Susan B. Anthony List v. Driehaus*, 134 S.Ct. 2334, 2014 WL 2675871, at *5 n.5 (U.S. 2014) (citation omitted). Such is the case here.

The trial court's judgment in this case is predicated entirely on its determination that Appellants failed to allege a palpable, concrete, cognizable injury as opposed to one that is hypothetical or conjectural or that may arise at some future date. Accordingly, the issue presented by this case, as we perceive it, is whether Appellants have asserted an actual, concrete injury as opposed to one that is conjectural or hypothetical. We therefore will address the trial court's judgment within the context of standing. The question of whether a party has standing to assert a claim is a question of law. *In re Estate of Smallman*, 398 S.W.3d 134, 148 (Tenn. 2013). Accordingly, our review is *de novo* with no presumption of correctness for the determination of the trial court. *Id*.

***The Appellants***

Ms. Howe is a lesbian who advocates for lesbian, gay, bi-sexual, and transgender ("LGBT") rights.[3] As noted above, she was a soccer coach at Belmont University and Appellants allege that her departure from Belmont following her announcement that she and her same-sex partner were having a baby precipitated the 2011 amendment to the Metro Code. Ms. Howe asserts that HB600 removes protections formerly provided by the Metro Code and exposes her to a heightened risk of discrimination based on her sexual orientation. She further submits that it renders her ability to advocate on behalf of gay and transgender persons "futile." Ms. Howe also submits that HB600 prevents her from obtaining local government assistance to redress discrimination against her.

Dr. Richmond is a transgender woman who lives in Nashville and, as president of the TTPC, advocates for gay and transgender equality at the state and local levels. She submits that the Act strips her of protections provided by the Metro Code; strips her of protections under state law by limiting discrimination based on sex to discrimination based on sex as designated on a person's birth certificate; prevents her from obtaining the assistance of local government to address discrimination against herself and other transgender persons; and exposes her to an increased risk of discrimination.

Mr. Roberts is also a Nashville resident, is a teacher at HFAMHS, and is a co-sponsor of the GSA-HFA. He submits that HB600 prevents the inclusion of sexual orientation and gender identification in Metro public school's anti-discrimination policy, limits his ability to protect students from harassment, and renders future efforts to advocate for students who face discrimination based on sexual orientation or gender identity.

Ms. Gilmore is an elected member of the Metro Council and supported the 2011 amendment to the Metro Code. She contends that HB600 curtails her ability to represent and advocate for her constituents.

The GSA-HFA is a student group composed of LGBT students which supports equality and fairness to LGBT students. It asserts that HB600 voids protections under the Metro schools' anti-discrimination policies, prevents its members from obtaining local government assistance, and prevents it from redressing discrimination against transgender members.

The TEP is a Nashville-based non-profit organization that seeks to promote and sustain equality for LGBT Tennesseans through the enactment of favorable legislation and

---

[3]The descriptions of Appellants are those provided in Appellants' amended complaint and brief.

the elimination of discriminatory laws. The TTPC is also a non-profit organization. It educates and advocates for legislation that is favorable to transgender persons at the local, state, and federal levels. The TEP and TTPC submit that their members include LGBT Tennesseans who are employees of Nashville city contractors who were stripped of the benefit of the 2011 amendment to the Metro Code. The TEP and TTPC assert that their members are "particularly harmed" by HB600 as it excludes transgender persons from protection under state law in addition to protection under the local ordinance. They further contend that HB600 impairs their ability to advocate at the local level. The TEP contends that it advocated for ordinances prohibiting discrimination based on sexual orientation and gender identity introduced in Shelby County in 2009 and in Memphis in 2010, that it intended to advocate for anti-discrimination ordinances in Memphis in 2011, and that HB600 rendered such advocacy futile. The TTPC also submitted that it advocated for the Memphis ordinances, was "in the process" of advocating for ordinances prohibiting discrimination based on sexual orientation and gender identity in Bristol, Chattanooga and Maryville, and that HB600 rendered its efforts futile.

### *Discussion*

We begin our discussion with some preliminary observations. First, although Appellants devote a considerable portion of the argument section of their brief to their argument that the provisions of HB600 violate equal protection guarantees, neither the merits nor constitutionality of HB600 are now before this Court. The only question now before us is whether any Appellant has demonstrated a distinct, palpable injury in-fact sufficient to confer standing to bring this action.

Second, we note that HB600 resulted in two statutory changes: 1) it added a definition of "sex" to the THRA, designating "sex" to mean the designation of male or female as provided on one's birth certificate; and 2) it created the Equal Access to Intrastate Commerce Act ("the ICA"), which currently is codified at Tennessee Code Annotated §§ 7-51-1801 & 1802. As noted above, that part of the ICA created by HB600 prohibits local governments from imposing on any person anti-discrimination standards or definitions that deviate from those provided by the THRA and other state law, and voids such local provisions imposed prior to enactment of the ICA.

Third, we note that the ICA was amended by chapter 91, section 2 of the 2013 Public Acts. As amended effective April 11, 2013, section 7-51-1802 currently provides:

(a)(1) No local government shall by ordinance, resolution, or any other means impose on or make applicable to any person an anti-discrimination practice, standard, definition, or provision that shall deviate from, modify,

-12-

supplement, add to, change, or vary in any manner from:

    (A) The definition of "discriminatory practices" in § 4-21-102 or deviate from, modify, supplement, add to, change, or vary any term used in such definition and also as defined in such section; or

    (B) Other types of discrimination recognized by state law but only to the extent recognized by the state.

(2) Any such practice, standard, definition, or provision imposed or made applicable to any person by a local government prior to May 23, 2011, shall be null and void.

    (b)(1)(A)No local government shall by ordinance, resolution, contract or any other means authorize or mandate, as a condition of a doing business within the jurisdictional boundaries of a local government or contracting with a local government, that employers establish a leave policy that deviates from, modifies, supplements, adds to, changes, or varies in any manner from state statutorily imposed or recognized requirements such as those authorized pursuant to § 4-21-408.

    (B) Subdivision (b)(1)(A) shall not apply if the local government is entering into a contract with the federal government and the federal government requirements are different from those imposed pursuant to state law.

(c) Except to the extent specifically required pursuant to any federal law, no local government shall by ordinance, resolution, contract or any other means, mandate or require, as a condition of a [sic] doing business within the jurisdictional boundaries of the local government or contracting with the local government, that employers must provide health insurance benefits to persons employed by such employer.

    (d) Subsections (a), (b) and (c) shall not apply with respect to employees of a local government.

Tenn. Code Ann. § 7-51-1802 (Supp. 2013).

Fourth, we note that none of the Appellants have alleged that either HB600 or its repercussions on the Metro Code has caused them to be discriminated against in-fact on the basis of sexual orientation or gender identification. No Appellant contends that he/she has been denied employment, terminated from employment, denied housing, or otherwise discriminated against on the basis of sexual orientation or gender identification in a manner that is capable of judicial redress. Additionally, the amendment to the Metro Ordinance voided by HB600 was applicable to persons furnishing supplies or services to the Metro

government; contracting for building and construction projects with the Metro government; contracting for projects for which funds of the Metro government were expended; and entering into a lease for use of a Metro government property or facility for a period exceeding six months. No Appellant asserts that he/she is or has attempted to be employed by any contractor or organization to which the amendment applied, was denied employment on the basis of sexual orientation or gender identity, or would have bid on a Metro government contract but for the repeal of the 2011 amendment to the Metro Code. Although Appellants assert that the Metro Code was amended in response to the departure of Ms. Howe from Belmont University following her announcement that she and her same-sex partner were having a baby, Ms. Howe's departure from Belmont was characterized by Ms. Howe as a "mutual decision" in Appellants' brief and in the trial court.

Fifth, we observe that the Metro Council is not a party to this action. With these observations in mind, we turn to the injuries asserted by Appellants.

### *Injuries Asserted*

Appellants assert multiple cognizable injuries for the purpose of standing. First, Appellants assert that HB600 creates a "structural barrier" that burdens their ability to obtain local anti-discrimination protections for LGBT persons, and that this burden constitutes an injury sufficient to provide standing. Second, Appellants submit that the fact that HB600 repealed previously available anti-discrimination protections constitutes a cognizable injury. Third, Appellants assert that HB600 subjects them to an immediate and substantial risk of discrimination, and that this risk constitutes an injury for the purposes of standing. Fourth, they allege that HB600's "gratuitous facial discrimination against transgender persons" constitutes a palpable and distinct injury. Fifth, they assert that Mr. Roberts and GSA-HFA have standing to challenge HB600 or obtain a judicial declaration that it excludes school policies. Sixth, they contend that Ms. Gilmore suffered a distinct injury where HB600 impedes the effectiveness of her legislative powers.

In their brief, Appellants rely on *United States v. Windsor*, 133 S. Ct. 2675 (2013), in support of their argument that courts must carefully scrutinize a law whose "principle purpose" and "necessary effect" is to "disparage and injure" gay persons and their families. As noted above, the purpose and constitutionality of HB600 are not presently before this Court. Additionally, the *Windsor* court noted:

> There is no dispute that when this case was in the District Court it presented
> a concrete disagreement between opposing parties, a dispute suitable for
> judicial resolution. '[A] taxpayer has standing to challenge the collection of a
> specific tax assessment as unconstitutional; being forced to pay such a tax

-14-

causes a real and immediate economic injury to the individual taxpayer." *Hein v. Freedom From Religion Foundation, Inc.*, 551 U.S. 587, 599, 127 S.Ct. 2553, 168 L.Ed.2d 424 (2007) (plurality opinion) (emphasis deleted). Windsor suffered a redressable injury when she was required to pay estate taxes from which, in her view, she was exempt but for the alleged invalidity of § 3 of DOMA.

*United States v. Windsor*, 133 S.Ct. 2675, 2684-85 (2013). That plaintiff Windsor suffered a concrete injury was not disputed in *Windsor*; it is the only inquiry here.

### *Structural Barrier*

Appellants rely on *Romer v. Evans*, 517 U.S. 620, 116 S.Ct. 1620 (1996); *Washington v. Seattle School Dist. No. 1*, 458 U.S. 457, 102 S. Ct. 3187 (1982); *Hunter v. Erickson*, 393 U.S. 385 (1969); and *Reitman v. Mulkey*, 387 U.S. 369 (1967) for the proposition that they have standing where the ICA invalidated a specific local ordinance that was adopted to protect a minority group and where Appellants are part of that minority group. Appellants argue that the ICA created an "unconstitutional structural barrier to the enactment of minority protections," and that their injuries are "virtually identical to the harms alleged by the plaintiffs in *Romer*, *Seattle*, *Hunter* and *Reitman*." Citing *Seattle School District*, 458 U.S. at 475 n.17, Appellants assert that they have "pled a constitutionally sufficient injury by alleging that they have been adversely impacted by 'the comparative structural burden placed on the political achievement of minority interests.'" They submit that the *Seattle School District* court "made very clear that such imposition of special burdens on the ability of individuals to secure minority protections is, in itself, a present, continuous, and ongoing injury sufficient to create a justiciable controversy." They further submit that the "injury exists regardless of whether the plaintiff alleges that he or she has already experienced discrimination as a result of the challenged law or whether the law facially targets a particular group."

In *Seattle School District*, a school district sued the State of Washington challenging a statute that prohibited the school board from requiring a student to attend a school other than the school nearest him, but contained exceptions that allowed the board to assign students to schools away from their neighborhood school for virtually all purposes other than to achieve racial desegregation. *Washington v. Seattle School District No.1*, 458 U.S. 457, 465, 102 S.Ct. 3187, 3192 (1982). Standing was not raised as an issue in *Seattle School District*, and the statute at issue in that case clearly directly impeded the plaintiff school district's ability to assign students to schools to achieve racial integration.

The ordinance challenged in *Hunter* was one that rendered Akron, Ohio's 1964 fair

housing ordinance ineffective by providing that

> [a]ny ordinance . . . which regulates the use, sale . . . of real property of any
> kind . . . on the basis of race, color, religion, national origin or ancestry must
> first be approved by a majority of the electors voting on the question at a
> regular or general election before such ordinance shall be effective. Any such
> ordinance in effect at the time of the adoption of this section shall cease to be
> effective until approved by the electors as provided herein.

*Hunter v. Erickson*, 393 U.S. 385, 387, 89 S.Ct. 557, 558 (1969). The plaintiff in *Hunter*, an African-American resident, brought a mandamus proceeding on behalf of herself, the municipality, and others similarly situated to require the city to enforce its fair housing ordinances. The plaintiff, Nellie Hunter, clearly demonstrated a distinct, palpable injury where she asserted "that a real estate agent had come to show her a list of houses for sale, but that on meeting Mrs. Hunter the agent 'stated that she could not show me any of the houses on the list she had prepared for me because all of the owners had specified they did not wish their houses shown to [N]egros.'" *Id.* at 387.

The *Reitman* Court affirmed the judgment of the California Supreme Court striking down a California constitutional provision that provided, in pertinent part:

> Neither the State nor any subdivision or agency thereof shall deny, limit or
> abridge, directly or indirectly, the right of any person, who is willing or desires
> to sell, lease or rent any part or all of his real property, to decline to sell, lease
> or rent such property to such person or persons as he, in his absolute
> discretion, chooses.

*Reitman v. Mulkey*, 387 U.S. 369, 371, 87 S.Ct. 1627, 1628-29 (1967). In so doing, the *Reitman* Court "accept[ed]" the holding of the California Supreme Court that the provision "involve[d] the State in private racial discriminations to an unconstitutional degree." *Id.* at 378-79, 1633. *Reitman* arose from two California court actions. *Id.* at 372, 1629. In the first case, *Mulkey v. Reitman*, the Mulkeys alleged that Reitman "had refused to rent them an apartment solely on account of their race." *Id.* In the second action, *Prendergast v. Snyder*, the Prendergasts sought an injunction prohibiting eviction from their apartment, which they alleged was racially motivated. *Id.* The plaintiffs in both actions sued under sections 51 and 52 of the California Code, which provided, in part:

> All persons within the jurisdiction of this State are free and equal, and no
> matter what their race, color, religion, ancestry, or national origin are entitled
> to the full and equal accommodations, advantages, facilities, privileges, or

services in all business establishments of every kind whatsoever. Whoever denies, or who aids, or incites such denial, or whoever makes any discrimination, distinction or restriction on account of color, race, religion, ancestry, or national origin, contrary to the provisions of Section 51 of this code, is liable for each and every such offense for the actual damages, and two hundred fifty dollars ($250) in addition thereto, suffered by any person denied the rights provided in Section 51 of this code.

*Id.* at n.3. The plaintiffs in *Reitman* undisputedly alleged concrete, palpable injuries in fact.

In *Romer v. Evans*, the Supreme Court affirmed the judgment of the Colorado Supreme Court enjoining enforcement of an amendment to the Colorado Constitution known as "Amendment 2." *Romer v. Evans*, 517 U.S. 620, 116 S.Ct. 1620 (1996). Amendment 2 provided:

> No Protected Status Based on Homosexual, Lesbian or Bisexual Orientation. Neither the State of Colorado, through any of its branches or departments, nor any of its agencies, political subdivisions, municipalities or school districts, shall enact, adopt or enforce any statute, regulation, ordinance or policy whereby homosexual, lesbian or bisexual orientation, conduct, practices or relationships shall constitute or otherwise be the basis of or entitle any person or class of persons to have or claim any minority status, quota preferences, protected status or claim of discrimination. This Section of the Constitution shall be in all respects self-executing.

*Id.* at 624, 1623. Amendment 2 repealed policies of, for example, the Metropolitan State College of Denver, Colorado State University, Aspen, Boulder, Denver, and Denver County that prohibited discrimination on the basis of sexual orientation. It also repealed previously enacted orders prohibiting discrimination for state employees and in Colorado state statutes, including for example, the Colorado Insurance Code. *Id.* at 626-27, 1624-25. Noting the Colorado Supreme Court's observation that "[t]he immediate objective of Amendment 2 [was], at a minimum, to repeal existing statutes, regulations, ordinances, and policies of state and local entities that barred discrimination based on sexual orientation," the *Romer* Court characterized Amendment 2 as effecting "[s]weeping and comprehensive . . . change in [the] legal status" of LGBT persons. *Id.* at 627, 1624-25. The Court noted that "Amendment 2, in explicit terms, [did] more than repeal or rescind" pre-existing provisions. *Id.* at 624, 1623. Rather, "[i]t prohibit[ed] all legislative, executive or judicial action at any level of state or local government designed to protect the named class[.]" *Id.*

Standing was not an issue addressed in *Romer*, and the Supreme Court identified the

-17-

plaintiffs as including "homosexual persons, some of them government employees." *Id.* at 625, 1624. Review of the Colorado Supreme Court's decision reveals that the plaintiffs included the named plaintiff, Richard G. Evans, eight other individuals, the Boulder School District, the City and County of Denver, the City of Aspen, and the City Council of Aspen. *Evans v. Romer*, 882 P.2d 1335, 1339 (Colo. 1994). In its judgment upholding the trial court's injunction enjoining enforcement of Amendment 2, the supreme court noted that Amendment 2

> alter[ed] the political process so that a targeted class [was] prohibited from obtaining legislative, executive, and judicial protection or redress from discrimination absent the consent of a majority of the electorate through the adoption of a constitutional amendment. Rather than attempting to withdraw antidiscrimination issues as a whole from state and local control, Amendment 2 singles out one form of discrimination and removes its redress from consideration by the normal political process. . . .
>
> In short, gay men, lesbians, and bisexuals are left out of the political process through the denial of having an "effective voice in the governmental affairs which substantially affect their lives." . . . Amendment 2 singles out and prohibits this class of persons from seeking governmental action favorable to it and thus, from participating equally in the political process.

*Evans v. Romer*, 854 P.2d 1270, 1285 (Colo. 1993). The court noted that Amendment 2 made successful participation in the political process impossible where any appeal to the government on any issue relating to discrimination based on sexual orientation would be unsuccessful "irrespective of [the plaintiffs'] ability to summon the support of others, or carry a majority in an election." *Id.* at n.28.

The issue in *Romer* was a constitutional amendment that not only repealed existing anti-discrimination ordinances, but, by its terms, prevented redress against discrimination based on sexual orientation. Amendment 2 effectively rendered all anti-discrimination advocacy on behalf of Colorado's LGBT community meaningless. It left an entire identified segment of Colorado voters out of the political process with respect to issues affecting them.

The ICA at issue in the present case is not only far less extensive, it is capable of redress through the political and judicial processes. Unlike Amendment 2 in *Romer*, the ICA does not render political activity for LGBT rights futile or impossible. It does not single out or prevent an entire class of persons from seeking favorable governmental action or from participating in the political process with respect to an issue of mutual concern. It does not render advocacy meaningless regardless of the LGBT's community's success in summoning

the support of others to prevail on the legislature to repeal subsection (a) of the ICA. It does not prevent the courts from declaring the ICA unconstitutional under the Tennessee Constitution or the United States Constitution in an action brought by a plaintiff with a distinct injury. Significantly, the ICA does not apply with respect to employees of a local government; it does not prohibit local governments from adopting anti-discrimination policies broader than those provided by State law with respect to local government employees; as discussed below, it does not apply to Local Education Agencies or schools. Rather, it prohibits local governments from expanding or varying the provisions of state anti-discrimination statutes with respect to local government contractors or those conducting business within the local government's jurisdictional boundaries.

That HB600 curtails that ability of local governments to expand the anti-discrimination protections imposed upon government contractors and local businesses beyond those imposed by state law is undisputed. In his brief, the Governor asserts that "[a]fter HB600, no group (including Plaintiffs and the innumerable others who may possess some characteristic for which they desire anti-discrimination protections) may obtain anti-discrimination protections beyond the scope of the THRA from a local government." He further asserts, "[c]onsequently, Plaintiffs here have suffered no special or unique legal injury not shared by a large portion of the population, and this supposed 'injury' does not confer standing."

Although HB600 curtails the authority of local governments to vary from the generally applicable State anti-discrimination laws, it does not impose a structural barrier to Appellants' ability to advocate for political change. The Colorado Constitutional amendment struck down by the courts in *Romer* rendered all LGBT advocacy in Colorado futile at every level and within every branch of state government. It barred a class of persons from equal participation in the political process. HB600 erects no such barrier.

### *Repeal of Previous Anti-discrimination Protections*: *The Metro Code*

We next consider Appellants' assertion that they have alleged an injury sufficient to confer standing because HB600 invalidated the 2011 amendment to the Metro Code and what Appellants characterize in their brief as "other similar local legislation." Appellants rely on *Hunter*, *Reitman*, and *Seattle School District* for the proposition that the loss of the protections afforded by the 2011 amendment to the Metro Code constitutes a cognizable injury. In their brief, Appellants assert that Ms. Howe, Dr. Richmond and the LGBT members of the TEP, the TTPC, and GSA-HFA "alleged that HB600 stripped them of previous protections from discrimination that were available to them under the Nashville Ordinance and local school policies that previously shielded LGBT students from discrimination and harassment."

As noted above, the anti-discrimination provisions of the 2011 amendment to the Metro Code were applicable, with exceptions not relevant here, to persons contracting for building and construction projects or furnishing supplies or services to the Metro government for which Metro funds were expended, and to persons entering into an agreement for the use of any Metro government property or facility with a lease term greater than six months. Neither Ms. Howe nor Dr. Richmond assert that they are within the category of persons to whom the Metro Code applied.

Although Ms. Howe was employed by a city contractor and submits that her "sudden departure from employment with a city contractor that did not have an anti-discrimination policy was the impetus for the Nashville anti-discrimination ordinance that led to HB600[,]" there is no dispute that Ms. Howe's departure from Belmont University, regardless of the cause, pre-dated the Metro Code amendment. Thus, the repeal of the ordinance had no impact on Ms. Howe's employment with a Metro contractor. Additionally, although Ms. Howe asserts that she was unable to secure another position "for many months" after leaving Belmont, she ultimately secured employment with the Nashville GLBT Chamber of Commerce and does not allege that she was denied employment with a Metro government contractor based on her sexual orientation. Similarly, Dr. Richmond does not assert that she was or is a Metro government contractor to whom the Metro Code applied. She cannot assert an injury based on the repeal of the ordinance.

The TEP and the TTPC assert that their members include LGBT Tennesseans who are employees of Nashville city contractors. They additionally submit that HB600 deprived those members of the protections afforded by the 2011 Metro Code amendment. As noted above, to establish standing an organizational member must establish that "(1) its members would otherwise have standing to sue in their own right; (2) the interests it seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted, nor the relief requested, requires the participation of individual members in the lawsuit." *American Civil Liberties Union of Tennessee v. Darnell*, 195 S.W.3d 612, 626 (Tenn. 2006) (citations omitted). Neither the TEP nor the TTPC have established that a member would have standing to sue in their own right.

The Supreme Court has opined that

When the government erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group, a member of the former group seeking to challenge the barrier need not allege that he would have obtained the benefit but for the barrier in order to establish standing. The "injury in fact" in an equal protection case of this variety is the denial of equal treatment resulting from the imposition of the barrier, not the

ultimate inability to obtain the benefit.

*Northeastern Florida Chapter of Assoc. Gen. Contractors of America v. City of Jacksonville*, 508 U.S. 656, 666, 113 S.Ct. 2297, 2303 (1993) (citations omitted). In *General Contractors*, the Court held that the organizational plaintiff in that case had standing to challenge a set-aside program established by the City of Jacksonville where it demonstrated that its members were "able and ready to bid on contracts and that a discriminatory policy prevented [them] from doing so on an equal basis." *Id.*

In the case now before us, however, neither the TEP nor the TTPC has identified any member who was in fact adversely impacted by the repeal of the 2011 amendment to the Metro Code. Moreover, neither organization has asserted that any member either bid on a contract but was denied based on their sexual orientation or gender identification, or that any member would have bid on a Metro contract but for the repeal of the 2011 Metro Code amendment. Neither organization has established or alleged that a discriminatory policy or the repeal of a previous anti-discrimination protection prevented a member from bidding on a contract on an equal basis.

Ms. Gilmore submits that she demonstrated a distinct injury as a result of the repeal of the Metro ordinance because the repeal impedes her ability to represent her LGBT constituents. As we have previously held, a plaintiff's "status as a public official does not confer a 'special interest' that is sufficient to establish standing." *State ex rel. Watson v. Waters*, No. E2009-01753-COA-R3-CV, 2010 WL 3294109, at *6 (Tenn. Ct. App. Aug. 20, 2010) (quoting *see Malone v. City of Knoxville*, No. E2002-00734-COA-R3-CV, 2003 WL 21018633, at *3 (Tenn. Ct. App, May 5, 2003)). With respect to state legislators, the *Darnell* court stated, "[l]egislators have no special right to standing simply by virtue of their status: like other plaintiffs, legislators must establish a distinct, concrete injury in fact." *Darnell*, 195 S.W.3d at 625 (citations omitted). A legislator may establish standing by demonstrating that the effectiveness of his vote or his ability to exercise his legislative powers has been impeded. *Id.* at 626. In *Darnell*, the court held that, although the legislator plaintiffs were outvoted, they had ample opportunity to discuss the challenged statute and to vote on the measure. *Id.* The court held that they accordingly had failed to demonstrate an injury sufficient to establish standing. *Id.* The supreme court extended this reasoning to city council members in *Fannon v. City of LaFollette*, where it rejected plaintiff city council member's assertion that, based on his obligation to enforce the council's processes, he had standing to file a declaratory judgment action alleging that other members of the council violated the Open Meetings Act during the course of adopting a resolution increasing the pay of some city employees. *Fannon v. City of LaFollette*, 329 S.W.3d 418, 426-27 (Tenn. 2010).

Ms. Gilmore's assertion that HB600 impedes her ability to represent the interests of her LGBT constituents on the Metro Council is not sufficient to establish standing where HB600 does not impede her delegated powers. It is well-settled that "local governments must exercise their delegated power consistently with the delegation statutes from which they derive their power." *421 Corp. v. Metropolitan Government of Nashville and Davidson County*, 36 S.W.3d 469, 475 (Tenn. Ct. App. 2000) (citing *see Henry v. White*, 194 Tenn. 192, 196, 250 S.W.2d 70, 71 (1952)). It is also well-settled that a municipal authority may not adopt an ordinance that "infringe[s] the spirit of state law or [is] repugnant to the general policy of the state." *Manning v. City of Lebanon*, 124 S.W.3d 562, 565 (Tenn. Ct. App. 2003). Ms. Gilmore's argument is predicated solely on her status as a Metro Council member having LGBT constituents; she has not demonstrated a distinct or palpable injury necessary to establish standing in this case.

Mr. Roberts and GSA-HFA assert they have standing to challenge HB600 or obtain a judicial declaration that it excludes school policies. As noted above, Mr. Roberts and GSA-HFA assert that HB600 hinders their ability to protect LGBT students from discrimination. In his answer, the Governor asserted "HB600 does not apply to Local Education Agencies and does not overturn, prohibit, or affect school anti-discrimination or anti-bullying policies in any way."

Although whether HB600 is applicable to Local Education Agencies or to school anti-discrimination policies was not addressed by the trial court, we note that it is well-settled that the construction of a statute is a question of law subject to a *de novo* review. *E.g., Gautreaux v. Internal Med. Educ. Found.*, 336 S.W.3d 526, 531 (Tenn. 2011) (citation omitted). In light of the Governor's answer, we hold that the provisions of HB600 do not apply to Local Education Agencies or to school policies. Mr. Roberts' and GSA-HFA's claims accordingly are not in controversy where they are predicated entirely on the potential affect of HB600 on policies designed to protect students from discrimination or bullying in Tennessee schools.

### *Repeal of Previous Anti-discrimination Protections*: *The THRA*

Dr. Richmond, the TEP, and the TTPC assert that Section 2 of HB600, which amended the THRA to add a definition of "sex" as "mean[ing] and refer[ring] only to the designation of an individual person as male or female as indicated on the individual's birth certificate[,]" deprived them of anti-discrimination protections previously afforded transgender persons. They contend that by limiting the definition of sex, "HB600 stripped them of protection under state laws prohibiting sex discrimination, unraveling years of state and federal jurisprudence."

The Governor, on the other hand, contends in his brief that "HB600 does not in any way affect[] any person's gender identity or their ability to exercise that gender identity free of discrimination[.]" The Governor asserts that the THRA and Title VII of the federal Civil Rights Act of 1964 prohibit discrimination against any individual on the basis of their failure to conform to gender stereotypes. The Governor submits, "transsexual individuals are protected from discrimination on the basis of sex (including discrimination for failure to conform to gender stereotypes) by the THRA and Title VII of the federal Civil Rights Act."

In their reply brief, Appellants assert that the Governor's contentions with respect to state law provisions prohibiting discrimination based on sex "largely misses the point" of their claim. They assert that Section 2 of HB600 "eliminates any protection for a transgender woman who is discriminated against *for being a woman*, or for a transgender man who is discriminated against *for being a man* - since the birth certificates of those transgender individuals will have their sex incorrectly identified." Appellants assert that HB600 is a "gratuitous elimination of [a] protection[] which affects only transgender Tennesseans and has nothing to do with HB600's stated goal of promoting uniformity in business regulations."

We are not called upon here to construe the THRA as it applies to transgender persons, however. Our only question here is whether Appellants have shown any injury to establish standing. Although Appellants assert the definition of "sex" as inserted into the THRA by HB600 "strips" them of previously afforded protections, they cite us to no Tennessee case interpreting the THRA as previously including transgender persons, and we find none. In *Blount County Education Association v. Blount County Board of Education*, we noted that sexual orientation was not a "categor[y] of discrimination" prohibited by the THRA. *Bounty County Educ. Ass'n v. Blount County Bd. of Educ.*, 78 S.W.3d 307, 318 (Tenn. Ct. App. 2002). Whether discrimination based on sexual orientation or gender identification is prohibited under federal law or other state law is not before us. In this case, however, we are not convinced that HB600 in fact repealed a protection previously afforded transgender persons under the THRA. Additionally, Dr. Richardson does not allege that she has been discriminated against in fact based on her sexual identity, and the organizational Appellants do not proffer a member who has in fact been harmed by Section 2 of HB600.

As noted above, the Governor has stated that HB600 does not apply to Local Education Agencies or schools. Accordingly, the claims of Mr. Roberts and the GSA-HFA with respect to the affects of HB600 are not in controversy. Neither Mr. Roberts nor the GSA-HFA have asserted a demonstrable injury in fact unrelated to the educational context.

### *Risk of Substantial and Immediate Discrimination*

We turn next to Appellants' assertion that HB600 "places them or their members at

-23-

immediate and substantial risk of discrimination" and that this risk is sufficient to confer standing. Appellants rely on *Romer* in support of their argument that standing does not require a plaintiff to demonstrate actual discrimination. Appellants submit, "[b]y reaching the merits in Romer, the Court necessarily concluded that a plaintiff who alleges an increased risk of discrimination as a result of a law's passage has standing to challenge the enactment, even if discrimination has not yet occurred." They additionally rely on *Seattle School District*, asserting that none of the plaintiffs in that case had "actually experienced discrimination as a result of the challenged" act. Appellants also contend that the Tennessee Supreme Court's decision in *City of Memphis v. Hargett*, 414 S.W.3d 88 (Tenn. 2013), and this Court's decision in *Campbell v. Sundquist*, 926 S.W.2d 250 (Tenn. Ct. App. 1996), stand for the proposition that the likelihood of discrimination is sufficient to establish standing notwithstanding the absence of a showing of discrimination in fact. The Governor, on the other hand, asserts that allegations of a hypothetical, conjectural risk of injury is insufficient to establish standing.

The limitations imposed by the doctrine of standing restricts courts from "'decid[ing] abstract questions of wide public significance . . . even though judicial intervention may be unnecessary to protect individual rights.'" *Darnell*, 195 S.W.3d at 620 (quoting *Warth v. Seldin*, 422 U.S. 490, 500 (1975)). "[I]njuries that are conjectural, hypothetical, or predicated upon an interest that a litigant shares in common with the general citizenry are insufficient" to establish standing. *City of Memphis v. Hargett*, 414 S.W.3d 88, 98 (Tenn. 2013) (citation omitted). "'[T]he essential element of standing is an allegation that the [challenged act] will inflict some injury on the complainant not common to the body of citizenry.'" *Campbell v. Sundquist*, 926 S.W.2d 250, 255 (Tenn. Ct. App. 1996), abrogated on other grounds by *Colonial Pipeline Co. v. Morgan*, 263 S.W.3d 827 (Tenn. 2008).

As discussed above, the plaintiffs in *Romer* and *Seattle School* district established sufficient injury to demonstrate standing. In *Campbell v. Sundquist,* the plaintiffs sought a declaratory judgment that the Homosexual Practices Act ("HPA"), a criminal law, violated equal protection guarantees and their right to privacy under the Tennessee Constitution.[4] *Campbell v. Sundquist*, 926 S.W.2d 250, 253 (Tenn. Ct. App. 1996). The plaintiffs in *Campbell* admitted that they had previously violated the HPA and alleged that they were injured by the HPA because it criminalized their intimate, private conduct. *Id.* They alleged that they accordingly believed that they were subject to prosecution for violating the HPA, and that, if convicted, they could lose their jobs, professional licenses, and housing. *Id.* They further asserted that, because they were homosexuals, the HPA imposed upon them a real

---

[4]The Homosexual Practices Act made consensual sexual penetration with a person of the same gender a Class C misdemeanor. Tenn. Code Ann. § 39-13-510 (1991).

threat of prosecution that was "'not common to the body of citizenry.'" *Id.* at 255. We affirmed the trial court's determination that plaintiffs had standing in *Campbell*, holding that, although none of the plaintiffs had been prosecuted under the HPA, their status as homosexuals "confer[red] upon them an interest distinct from that of the general public with respect to the HPA." *Id.* at 256. The plaintiffs in *Campbell* faced an actual threat of criminal prosecution as a result of their past conduct and likely future conduct based upon their sexual orientation. Appellants in the current case face no such threat and allege no actual instance of discrimination. HB600 does not criminalize their status as LGBT citizens; it does not prohibit personal conduct; and it does not impede the right to political advocacy on the part of any Tennessean, regardless of their sexual orientation or gender identification.

*Hargett* was an action filed by the City of Memphis and two Memphis voters seeking a declaratory judgment that photo identification cards issued by the Memphis City Library were valid evidence of identification for the purposes of the Voter Identification Act ("VIA") signed into law in 2011. *City of Memphis v. Hargett*, 414 S.W.3d 88 (Tenn. 2013). The individual plaintiffs in *Hargett* were Memphis voters who were not permitted to utilize photo library cards as a means of identification at early voting locations during the August 2012 primary elections.[5] *Id.* at 94. The supreme court determined that the City of Memphis lacked standing to challenge the determination of the State Coordinator of Elections and Secretary of State Tre Hargett that photo library cards did not constitute an acceptable form of identification under the VIA where the City's asserted injury - infringement on its statutory right to issue voter identification cards - were mooted by amendments to the VIA in 2013. *Id.* at 100-101. The *Hargett* court determined that the individual plaintiffs had established an injury sufficient to confer standing, however, where they

> assert[ed] multiple infringements of their right of suffrage, including claims that the photo ID requirement established by the [VIA] unlawfully burdens their ability to cast an in-person ballot, impermissibly adds a voting qualification to those enumerated in our constitution, and violates their right to equal protection by imposing different requirements for in-person and absentee voters.

*Id.* at 99. The *Hargett* court held that

---

[5]The individual plaintiffs were permitted to cast provisional ballots and instructed that they were required to present a valid form of photo identification to the Election Commission by August 6, 2012, in order for their votes to be counted. *Hargett*, 414 S.W.3d at 94.

the claimed injuries [were] palpable, as opposed to conjectural or hypothetical, because they [were] founded upon the undisputed allegations that [the plaintiffs] attempted to cast in-person ballots in the August 2012 primary election but were unable to do so because they did not possess photo ID cards recognized by election officials as valid evidence of identification under the [VIA].

*Id.* The court determined that the plaintiffs "likewise met the requirement of asserting a distinct injury by alleging that they were personally prevented from having their votes counted, as opposed to merely relying upon their status as citizens who may eventually seek to exercise their right to vote." *Id.*

We disagree with the argument forwarded by Appellants in the current case that standing in *Hargett* was predicated on allegations of a hypothetical future injury. The individual plaintiffs in *Hargett* were denied the fundamental right of suffrage after having been assured by the City of Memphis that photo library cards constituted an acceptable form of voter identification. We note that the *Hargett* court observed that, in *Common Cause/Georgia v. Billups*, which addressed a "virtually identical standing issue," the Eleventh Circuit ruled:

Even if [the plaintiffs] possessed an acceptable form of photo identification, they would still have standing to challenge the statute that required them to produce photo identification to cast an in-person ballot. A plaintiff need not have the franchise wholly denied to suffer injury. Any concrete, particularized, non-hypothetical injury to a legally protected interest is sufficient. Requiring a registered voter either to produce photo identification to vote in person or to cast an absentee or provisional ballot is an injury sufficient for standing.

*Id.* at 100 (quoting *Common Cause/Ga. v. Billups*, 554 F.3d 1340, 1351-52 (11th Cir. 2009) (citation and internal quotation marks omitted)). The *Hargett* court agreed with the Eleventh Circuit's assessment, stating that the plaintiffs' injuries were "predicated upon their entitlement to vote in person, free of the photo ID requirement." *Id.* at 99. The holding of the court in *Hargett* was not predicated on a hypothetical possibility of some future injury; it was grounded on an actual injury to the plaintiffs' right to vote, "free of the photo ID requirement."

Appellants in this case reference no actual instance of discrimination as a result of HB600. They have not been denied a fundamental right. Their allegations of immediate risk of discrimination are hypothetical and conjectural and are insufficient to confer standing.

### *Facial Discrimination*

We turn finally to Appellants' contention that Section 2 of HB600, which adds the above referenced definition of "sex" to the THRA, constitutes "gratuitous facial discrimination" that targets transgender persons and evidences HB600's "discriminatory purpose." Appellants' argument, as we understand it, is that because the THRA has been interpreted as coextensive with federal law, and because the THRA as amended by HB600 now differs from protections available under Title VII of the federal Civil Rights Act, HB600 "withdraws previously existing protections and exclud[es] transgender Tennesseans, and only transgender Tennesseans, from the full scope of protection against sex discrimination that is available to all other residents of the state[.]"

As Appellants assert, the THRA "is a comprehensive anti-discrimination law . . . intended to further the policies embodied in the similar federal laws[.]" *Wilson v. Rubin*, 104 S.W.3d 39, 48 (Tenn. Ct. App. 2002) (internal citation omitted). Additionally, "[i]n light of the intended overlap in purpose between the [THRA] and federal anti-discrimination laws, Tennessee's courts regularly consult the decisions of their federal counterparts for guidance when called upon to construe and apply the [THRA]." *Id.* (citations omitted). Federal precedents are not binding on the courts of Tennessee with respect to actions brought under Tennessee law, however, "and do not limit our ability to give the fullest possible effect to the [THRA]. *Id.* n.6 (citations omitted).

Appellants argument, as we perceive it, is that the divergence from federal law that allegedly results from the impact of HB600 on the THRA constitutes an injury sufficient for standing. We must disagree. Neither Dr. Richmond, the sole individual transgender Appellant, nor the organizational Appellants reference any direct, palpable injury caused by the addition of the definition of "sex" to the THRA by HB600. Without opining on whether the THRA remains coextensive with federal law with respect to anti-discrimination protections afforded to transgender persons, we find no allegation of injury sufficient to confer standing to challenge HB600 on this basis.

### *Holding*

It is undisputed in this case that HB600 does not apply to Local Education Agencies or Tennessee schools, and we so hold. The claims of Mr. Roberts and GSA-HFA accordingly are dismissed as moot. In light of the foregoing discussion, we affirm the judgment of the trial court dismissing the claims of Ms. Howe, Dr. Richmond, Ms. Gilmore, the TEP, and the TTPC for lack of standing where they have failed to establish any direct, cognizable injury. Costs on appeal are taxed to the appellants, Lisa Howe, Erica Gilmore, Marisa Richmond, Wesley Roberts, the Tennessee Equality Project, and the Tennessee

Transgender Political Coalition.  This matter is remanded to the trial court for enforcement of the judgment and the collection of costs.


_____
DAVID R. FARMER, JUDGE